Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org

Laura H. King
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
king@westernlaw.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| 350 MONTANA, MONTANA ENVIRONMENTAL INFORMATION CENTER, SIERRA CLUB, WILDEARTH GUARDIANS, <br><br>       Plaintiffs, <br><br>    vs. <br><br> DAVID BERNHARDT, in his official capacity as Acting Secretary of the Department of the Interior, U.S. OFFICE OF SURFACE MINING, an agency within the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR, a federal agency, MARCELO CALLE, in his official capacity as Program Support Division Manager of U.S. Office of Surface | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Mining Western Region; DAVID
BERRY, in his official capacity as
Regional Director of U.S. Office of
Surface Mining Western Region;
GLENDA OWENS, in her official
capacity as Director of U.S. Office of
Surface Mining; and JOSEPH
BALASH, in his official capacity as
Assistant Secretary of Land and
Minerals Management of the U.S.
Department of the Interior,

               Defendants.

## INTRODUCTION

1.     On August 14, 2017, this Court held that Federal Defendants failed to

lawfully disclose how coal trains and coal combustion resulting from a 7,000-acre

expansion of the Bull Mountains Mine would affect the human environment. That

same day a loaded coal train derailed near the town of Noxon, Montana, spilling

coal into the Clark Fork River. The spilled coal later caught fire.

2.     In its August ruling, this Court concluded that it was arbitrary and

unlawful for Federal Defendants to trumpet the economic benefits of the mine

expansion, while refusing to acknowledge the economic costs. This Court further

determined the agencies' decision to forego preparation of an environmental

impact statement (EIS) was arbitrary and capricious.

3.     After this Court remanded the matter, the Federal Defendants again

approved the expansion, issuing a finding of no significant impact in May 2018,

and approving the mine expansion (called a mining-plan modification) in August 2018. The agencies failed to provide any notice of their decision to members of the public who opposed the mine expansion.

4.     In once more approving the mine expansion, Federal Defendants doubled down on their original errors by expanding and increasing their analysis of economic benefits of the proposed mine expansion while once more *refusing* to acknowledge and quantify the economic costs of the expansion. The agencies did so in the face of expert evidence that the harm from the mine expansion, from greenhouse gas pollution and toxic and harmful air pollution, would cost the public billions of dollars and be 5 to 15 times *greater than* the economic benefits of the mine.

5.     On remand, Federal Defendants again refused to prepare an EIS, despite evidence that, among other things, the mine expansion would cost the public billions of dollars from pollution from coal combustion, the air pollution from burning the coal will have significant health impacts on everyone downwind, the thousands of coal trains from the mine will repeatedly violate the Clean Water Act by spilling coal into Montana's waters without a permit, and the mine expansion and the resulting coal trains may adversely affect threatened and endangered species, including grizzly bear.

6.     Because Federal Defendants failed to correct their unlawful analysis, the Conservation Groups—350 Montana, Montana Environmental Information Center (MEIC), Sierra Club, and WildEarth Guardians—are forced to once again seek relief from this Court.

## JURISDICTION AND VENUE

7.     This Court has federal-question jurisdiction over this action, 28 U.S.C. § 1331, which arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the APA, 5 U.S.C. §§ 701-706.

8.     The requested declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Montana and a substantial part of the property that is the subject of the action, the Bull Mountains Mine, is located in Montana. Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) because officers of the United States are defendants, and Plaintiffs 350 Montana and MEIC reside in Montana.

10.     Venue is also proper in the Missoula Division of this Court because Plaintiff 350 Montana resides in Missoula, and Plaintiffs WildEarth Guardians and Sierra Club have offices in Missoula. Impacts from the mine's coal trains will be felt within the geographical boundaries of the Missoula Division.

4

11.     The Conservation Groups have standing under Article III of the U.S. Constitution because the challenged actions cause them economic, professional, recreational, and aesthetic harm, which will be remedied by a favorable ruling from this Court.

12.     The challenged actions are final and subject to judicial review under 5 U.S.C. §§ 702, 704, 706.

13.     The Conservation Groups have exhausted any and all available and required administrative remedies.

## PARTIES

14.     Plaintiff 350 Montana is a Montana-based nonprofit organization based in Missoula that works to reduce atmospheric carbon dioxide ($CO_2$) concentrations to 350 ppm by implementing strategic actions and advocating policies to end fossil fuel burning with the greatest urgency. 350 Montana envisions a rapid conversion to a 100 percent renewable global energy system using wind, water, and solar. 350 Montana works with the global grassroots climate movement to achieve these goals and safeguard Earth's life-support systems.

15.     Plaintiff Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 3,000 members throughout the United States and the State of Montana. MEIC is dedicated to the

5

preservation and enhancement of the natural resources and natural environment of

Montana and to the gathering and disseminating of information concerning the

protection and preservation of the human environment through education of its

members and the general public concerning their rights and obligations under

local, state, and federal environmental protection laws and regulations. MEIC is

also dedicated to assuring that federal officials comply with and fully uphold the

laws of the United States that are designed to protect the environment from

pollution. MEIC and its members have intensive, long-standing recreational,

aesthetic, scientific, professional, and spiritual interests in the responsible

production and use of energy, the reduction of greenhouse (GHG) pollution as a

means to ameliorate our climate crisis, and the land, air, water, and communities

impacted by climate change. MEIC members live, work, and recreate in areas that

will be adversely impacted by the Bull Mountains Mine expansion. MEIC brings

this action on its own behalf and on behalf of its adversely affected members.

16.    Plaintiff Sierra Club is a national nonprofit organization with 64

chapters and over 700,000 members nationwide, including more than 2,900 in

Montana, dedicated to exploring, enjoying, and protecting the wild places of the

earth; to practicing and promoting the responsible use of the earth's ecosystems

and resources; to educating and enlisting humanity to protect and restore the

quality of the natural and human environment; and to using all lawful means to

6

carry out these objectives. Sierra Club's concerns encompass the exploration, enjoyment and protection of the lands and waters of Montana. The Sierra Club's particular interest in this case and the issues, which the case concerns stem from the impacts to water resources from the Bull Mountains Mine expansion, the impacts of coal trains shipping coal from the Bull Mountains Mine, and the air pollution impacts from the eventual combustion of the coal. The Montana Chapter of the Sierra Club has more than 2,900 members in the State of Montana. The Montana Chapter of the Sierra Club brings this action on its own behalf and on behalf of its adversely affected members.

17.    Plaintiff WildEarth Guardians (Guardians) is a nonprofit conservation organization with more than 200,000 members and activists throughout the United States, including nearly 900 in Montana. Guardians has a major office in Missoula, Montana. Guardians' mission is to protect and restore the wildlife, wild rivers, wild places, and health of the American West. Through its Climate and Energy Program, Guardians is dedicated to protecting the American West from the dangers it faces from the climate crisis. Guardians' members and staff have recreational, aesthetic, scientific, professional, and spiritual interests in a protected and stable climate, and an environment that is sustained by a protected and stable climate. Guardians' members use and plan to continue to live in, use, and enjoy landscapes

impacted by the Bull Mountains Mine. Guardians brings this action on its own behalf and on behalf of its adversely affected members.

18.     Defendant U.S. Office of Surface Mining (OSM) is a federal agency within the U.S. Department of the Interior that is responsible for assuring lawful environmental review of mining plan modifications under NEPA and recommending approval, conditional approval, or disapproval of applications for mining plan modifications. OSM's Western Regional Office conducted the environmental review of the mining plan modification for the expansion of the Bull Mountains Mine, concluding that the expansion would not significantly affect the environment.

19.     Defendant U.S. Department of the Interior is a federal department responsible for implementing and complying with federal laws governing approval of mining plan modifications, including NEPA.

20.     Defendant Marcello Calle is Program Support Division Manager of U.S. Office of Surface Mining Western Region. Mr. Calle is responsible for managing federal coal resources, including those involved in this action. Mr. Calle is responsible for implementing and complying with NEPA and other federal laws governing review and approval of applications for mining plan modifications. Mr. Calle approved OSM's finding of no significant impact (FONSI) for the 7,000 acre Bull Mountains Mine expansion.

21.     Defendant David Berry is Regional Director of OSM's Western Region. Mr. Berry is responsible for managing federal coal resources, including those involved in this action, and for making recommendations to the Secretary of the Interior regarding applications for mining plan modifications. Mr. Berry is also responsible for implementing and complying with NEPA and other federal laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications.

22.     Defendant Glenda Owens is acting Director of OSM. Ms. Owens is responsible for assuring that OSM complies with federal laws, including NEPA and other laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications.

23.     Defendant Joseph Balash is Assistant Secretary of Land and Minerals Management of the U.S. Department of the Interior. Mr. Balash is responsible for complying with federal laws governing approval, conditional approval, or disapproval of applications for mining plan modifications. Mr. Balash approved the mining plan modification, allowing the massive expansion of the Bull Mountains Mine.

24.     Defendant David Bernhardt is Acting Secretary of the U.S. Department of the Interior. Mr. Bernhardt is responsible for implementing and

complying with federal laws governing mining plan modifications, including NEPA.

**FACTS**

25.     The Bull Mountains Mine is an underground, longwall mining operation, which allows the mine roof to collapse or subside as the mining process advances. The subsidence causes splitting and depression of the surface land above the mining operation.

26.     Signal Peak Energy, LLP (Signal Peak), owns and operates the Bull Mountains Mine, located in the Bull Mountains south of the Musselshell River and the town of Roundup, Montana.

27.     Signal Peak first obtained its mining permit for the Bull Mountains Mine in 2008. In the time prior to that, the mine was owned and sold by multiple business entities that did not pursue coal mining.

28.     Signal Peak was originally a joint venture between FirstEnergy, an energy producing company with coal-fired power plants in the Midwest, and Boich Companies, a coal marketing company based in Ohio.

29.     In 2008, Signal Peak filed a coal lease-by-application with the U.S. Bureau of Land Management (BLM) to lease 61.4 million tons of federal coal on approximately 2,700 acres adjacent to the then-existing mining operation. The proposed federal coal lease would unlock an additional 71.6 million tons of

mineable coal on state and private land that would not otherwise be accessible or economically feasible to mine.

**SIGNAL PEAK PRESSURES FEDERAL AGENCIES TO FOREGO AN EIS**

30.     BLM initially determined that an in-depth environmental impact statement (EIS) was required because of controversy and uncertainty related to leasing coal necessary to significantly expand the mine; the potential for lease to serve as precedent for further expansions of the mine, and potential significant impacts, including long-term impacts to Musselshell County after the inevitable closure of the mine.

31.     Signal Peak opposed preparation of an EIS, asserting that a yearlong lapse in approval of the lease would be fatal to the mine. Signal Peak's lawyers stated that they were aware of, among other things, "litigation risks" of foregoing an EIS and that they were "quite comfortable" with doing so.

32.     In 2011, after preparing an environmental assessment (2011 Lease EA) to consider the potential significance of the proposed lease, BLM issued a finding of no significant impact (FONSI) and approved the proposed lease.

33.     BLM's 2011 Lease EA and FONSI stated that one goal of the coal lease was to generate public revenue from lease bonus payments and lease royalty payments. Another goal of the lease, according to BLM, was to meet national energy needs in the United States.

11

## SIGNAL PEAK TURNS TO COAL EXPORTS

34.     In 2011, a subsidiary of the Gunvor Group, Pinesdale LLC, purchased a one-third interest in the Bull Mountains Mine for approximately $400 million.

35.     The Gunvor Group is a leading global commodities trader, registered in Cyprus and headquartered in Switzerland. Signal Peak stated at the time that this purchase would facilitate coal exports from the Bull Mountains Mine to Asia and South America.

36.     U.S. Treasury Department has announced that Russian President Vladimir Putin has investments in Gunvor. The United States government has sanctioned the co-founder of Gunvor, who has personal ties to Russian President Vladimir Putin. U.S. State Department cables have relayed allegations that Gunvor is a front for "massive corruption."

37.     Signal Peak purchased export capacity at the Westshore coal-export terminal at Roberts Banks in Vancouver, Canada, guaranteeing the mine access to Asian and South American markets.

38.     By 2014, 95% of the coal from the mine was being shipped overseas. In 2018, OSM projected that 96% of the coal would be exported through the Westshore coal-export terminal.

## IMPACTS TO WATER

39.     Agriculture provides the economic base for the region around the Bull Mountains and is wholly dependent on water. High quality water in the region is, however, scare and therefore extremely important.

40.     The region of the Bull Mountains overlying the Bull Mountains Mine contains scattered intermittent and perennial streams and wetlands fed in part by groundwater.

41.     Wetlands are extremely rare in the Bull Mountains, accounting for less than 0.1 percent of the area. These scattered wetlands play an ecologically critical role in the area by providing drinking water for wildlife, habitat for aquatic and semi-aquatic life, and rich plant communities that provide critical forage and habitat for wildlife.

42.     The long-wall mining method used by Signal Peak at the Bull Mountains Mine and proposed for the mine expansion results in subsidence or collapse of the land above the mine.

43.     Subsidence can impact ground and surface water above the mine area by drying up spring-fed intermittent and perennial streams and associated wetlands.

44. To date, all five springs that have been undermined in the Bull Mountains and that have been evaluated by regulators have been impacted in terms of either water quality or water quantity.

45. Of the five springs that have been evaluated, four have shown diminished water levels and two of the four have actually gone dry.

46. Regulators relied on ground water in a sandstone aquifer beneath the mine, known as the "deep underburden aquifer" or "deep aquifer," as the most viable source of replacement water to mitigate impacts to water resources above the mine. Other possible methods of mitigation are either currently unavailable or are untested.

47. It is uncertain whether the deep aquifer has enough high quality water that is physically and legally available to replace impacted water sources.

48. Median sodium levels in the deep aquifer exceed the upper limits for sodium in livestock watering guidelines used by the State of Montana.

49. Neither state regulators nor Federal Defendants assessed whether water in the deep aquifer was legally available to be used to mitigate impacts to water resources from the mine.

50. The Musselshell River, to which much of the mine area drains, is closed to new surface water appropriations during summer months.

51.    State regulators believe that state law prohibits Signal Peak from using water from the deep aquifer to replace intermittent or perennial streams.

52.    While Signal Peak's consultant prepared a groundwater model for the deep aquifer that could be used to assess whether the aquifer would be able to support long-term mitigation, neither state regulators nor Federal Defendants used the model to evaluate whether the deep aquifer could meet potential mitigation needs.

53.    The report on the characteristics of the deep aquifer prepared by Signal Peak's consultant was based on an assumption that the deep aquifer was a continuous geologic layer beneath the mine.

54.    Published geological reports of the geology of the Bull Mountains have concluded that the sandstone aquifers are not continuous, but lenticular and cannot be traced over large areas of the subsurface of the Bull Mountains.

55.    Sandstone layers in the Bull Mountains were formed from alluvial channels, which did not create extensive layers.

56.    The only empirical evaluation of the capacity of the deep aquifer to produce water for mitigation recorded significant levels of aquifer drawdown after only modest pumping for a short period of time.

57.    One expert who has evaluated the hydrology of the Bull Mountains related to the proposed mine expansion concluded that it is highly doubtful that the

deep aquifer has sufficient capacity to meet potential mitigation needs and has not been adequately evaluated.

## COAL TRAINS

58.     Coal from the mine is shipped by train. In its 2011 environmental assessment, BLM asserted that "[t]ransportation of coal by railroad is a connected action." Virtually all—96%—coal from the mine expansion is expected to be shipped by train to the Westshore coal export terminal in Vancouver, British Columbia, where it will be exported to Japan and Korea.

59.     The proposed mine expansion will result in approximately 3.6 coal trains going to and coming from the mine each day, 365 days a year, for 9 years.

60.     There are only two westward train routes across Montana from the Bull Mountains Mine toward the Westshore coal export terminal.

61.     The northern route parallels Glacier National Park, the Bob Marshall Wilderness, and portions of the wild and scenic Flathead River. The southern route runs adjacent to portions of the Cabinet Mountains Wilderness.

62.     These train routes cross numerous Montana communities designated as non-attainment areas for not meeting national ambient air quality standards, including Billings, Laurel, Great Falls, East Helena, Missoula, Kalispell, Whitefish, Libby, and Thompson Falls.

16

63.     The American Lung Association determined in 2017 that Missoula was one of the top-25 most polluted cities in the nation for short-term particle pollution. The American Lung Association further determined that Lincoln County, Montana, was among the top-25 most polluted counties in the nation for short-term particle pollution and also among the top-25 most polluted counties in the nation for year-round particle pollution.

64.     In 2017 the American Lung Association assigned failing grades to Flathead, Lewis and Clark, Lincoln, and Missoula Counties for having short-term particulate pollution that repeatedly exceeded air quality standards. During the proposed life of the mine expansion, over 10,000 coal trains from the Bull Mountains Mine will chug through each of these counties, on average of 3.6 trains each day.

65.     During 2017, air quality in Missoula exceeded short-term air quality standards for particulate pollution on 18 days.

66.     Diesel exhaust from coal trains is likely carcinogenic to humans, meaning it tends to cause cancer.

67.     Each year for nine years trains from the mine expansion will emit approximately 100 pounds of large and small particulate pollution per mile and approximately 2000 pounds of nitrogen oxides per mile. This pollution will add to

17

existing pollution levels in the communities the coal trains cross. This pollution will worsen conditions in non-attainment areas.

68.     Coal dust blows and falls off coal trains as they travel.

69.     The train lines west from the Bull Mountains Mine to the Westshore export terminal cross numerous surface waters including the Yellowstone River, the East Gallatin River, the Missouri River, the Little Blackfoot River, the Clark Fork River, Rattlesnake Creek, and the Thompson River.

70.     Portions of the Missouri, Clark Fork, Little Blackfoot, and Thompson Rivers are impaired and not fully supporting aquatic life due to sedimentation.

71.     The train lines west from the Bull Mountains to the Westshore export terminal cross portions of the Missouri, Clark Fork, Little Blackfoot, and Thompson Rivers that are impaired for sediment.

72.     Coal dust from the coal trains from the proposed expansion of the Bull Mountains Mine will be deposited in surface waters.

73.     The coal train operators do not have permits under the Clean Water Act to discharge coal or coal dust into surface waters in Montana, Idaho, or Washington.

74.     Coal trains from the Bull Mountains Mine may derail while traveling to the Westshore export terminal.

75.     Multiple coal trains have derailed in Montana, Idaho, and Washington in the last ten years, including derailments that spilled coal into the Yellowstone River near Columbus, Montana, in 2018 and into the Clark Fork River near Heron, Montana, in 2017.

76.     The deposition of coal dust in surface waters and coal train derailments into surface waters may harm aquatic life, including threatened and endangered fish.

77.     The train routes that across Montana from the Bull Mountains Mine toward the Westshore export terminal traverse occupied grizzly bear habitat.

78.     Grizzly bears have been killed in train collisions along each route from the Bull Mountains Mine west to the coal export terminal in Canada.

79.     Grizzly bears are attracted to train tracks to feed on wildlife and livestock carrion, grain leaked from grain cars, garbage dumped on the tracks, and vegetation growing along the tracks.

80.     Train collisions have been one of the leading sources of grizzly bear mortality in Montana and Idaho.

81.     Between 1998-2011, 31 known grizzly bears mortalities in Northern Continental Divide Ecosystem were caused by train collisions.

82.     Grizzly bears have been struck and killed by trains near the towns of Heron, Montana, Noxon, Montana, Dixon, Montana, and Bonners Ferry, Idaho.

19

83.     Grizzly bears were also struck and killed by trains along the Middle Fork of the Flathead River and the Clark Fork River adjacent to the Cabinet Mountains.

## COAL COMBUSTION

84.     It is foreseeable that the coal extracted at the Bull Mountains Mine will be burned in coal plants to generate electricity.

85.     Coal is the world's most polluting fossil-fuel.

86.     When burned, coal releases numerous pollutants, including sulfur dioxide ($SO_4$), oxides of nitrogen ($NO_x$), particulate matter (PM), mercury, lead, and carbon dioxide ($CO_2$). These pollutants are harmful to people and the environment.

87.     Particulate matter, sulfur dioxide, and nitrogen oxides cause premature mortality, bronchitis cases, asthma cases, hospital admissions related to respiratory, cardiac, asthma, chronic obstructive pulmonary disease, and ischemic heart disease problems and emergency room visits.

88.     Mercury and lead are powerful neurotoxins. There is no safe exposure level of mercury or lead for children. Coal-fired power plants are the primary source of mercury and lead exposure for young children in the United States.

89.     Children are at high risk of pollution-related disease.

90.     Even if air pollution controls are installed on coal-fired power plants, health impacts still occur.

91.     Each year thousands of people in the United States die from air pollution from coal-fired power plants.

92.     In Japan and South Korea, 51-75 people per 100,000 die each year from air pollution.

93.     Approximately, 96% of the coal from the Bull Mountains Mine expansion is expected to be exported, mainly to Japan and South Korea.

94.     Air pollution from coal-fired power plants, including $NO_x$, PM, and mercury is dispersed to the United States, worsening air pollution problems and mercury deposition. Because of mercury deposition, approximately 68% of fish sampled in the western United States have mercury levels that make them unsuitable for regular human consumption.

95.     The combustion of the coal from the Bull Mountains Mine expansion will emit 1,494 to 2,938 tons of $PM_{10}$; 1,445 to 2,287 tons of $PM_{2.5}$; up to 38,750 tons of $NO_x$; 3,971 to 19,855 tons of $SO_2$, 50 to 994 lbs. of lead, and 50 to 306 lbs. of mercury each year for nine years.

96.     Life-cycle operations of coal extraction, transportation, and combustion will result in the emission of approximately 190 million tons of carbon dioxide equivalent (Mt $CO_2e$).

21

97.    Greenhouse gas emissions from human activities are the only factor that can account for the observed planetary warming over the last century.

98.    Greenhouse gas emission from the proposed mine expansion will intensify the climate change impacts that are already occurring in Montana and the world, including large forest fires, increased heatwaves, and more serve drought.

99.    Climate change can exacerbate conflict, which can affect national security.

100.   The cascading impacts of climate change threaten national security, public health, and the economy.

101.   Continued greenhouse gas emissions increase the likelihood of severe, pervasive, and irreversible damage to people, species, and ecosystems.

102.   Major reductions in greenhouse gas emissions and urgent action are required to avoid severe, pervasive, and irreversible damage to people, species, and ecosystems from climate change.

103.   The future risks of climate change depend on decisions made today.

104.   The costs of air pollution for coal combustion are significant.

105.   The damages from non-GHG air pollution from the coal mined at the Bull Mountains Mine is approximately $67/ton, which is more than double the value of the coal, which, Federal Defendants optimistically and unrealistically

22

project to be $32.50/ton. The non-GHG emissions from the mine expansion will cause approximately $7.2 billion dollars in economic damage.

106.   The economic damages from the greenhouse gas emissions caused by mining, shipping, and burning the coal from the Bull Mountains Mine expansion, as calculated by the social cost of carbon, are between $29-$296/ton of coal, which also dwarfs the total value of the coal. The GHG emissions from the mine expansion will cause $4.2-$22.1 billion dollars in economic damage.

107.   The social cost of carbon is conservative because it omits multiple impacts that would increase economic damages to the public.

108.   The total externalized damages from the GHG emissions and the non-GHG air pollution from the mine expansion is $95-$350/ton of coal, or $11.4-$29.3 billion, vastly exceeding the economic benefits of the mine expansion.

## UNLAWFUL DECISION AND REMAND

109.   After this Court determined in 2017 that Federal Defendants failed to adequately evaluate the environmental impacts of the proposed mine expansion, the Federal Defendants conducted another analysis on remand.

110.   This Court imposed a limited injunction pending Federal Defendants compliance with NEPA on remand.

111.   The Citizens submitted public comments during scoping and after Federal Defendants issued a draft EA.

23

112.   Federal Defendants issued a draft EA on March 13, 2018, and allowed for a 29-day public comment period.

113.   The Citizens requested an extension of the comment period. Federal Defendants rejected the requested extension.

114.   On May 21, 2018, OSM signed a finding of no significant impact (FONSI).

115.   On August 3, 2018, Federal Defedant issued a final EA, and Mr. Balash approved the mine expansion.

116.   Federal Defendants never published a public notice of the approval of the expansion.

117.   Federal Defendants never notified the Citizens of their decision to approve the min expansion or of their issuance of the final EA and FONSI.

118.   Neither Federal Defendants nor Signal Peak petitioned this Court to lift its injunction.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (NEPA Violation: Failure to Prepare an EIS)

119.   The Citizens incorporate by reference all preceding paragraphs.

120.   NEPA requires federal agencies to prepare an EIS for any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).

121.   In assessing whether an action may significantly affect the quality of the human environment, federal agencies must consider a list of ten significance factors, as well as the context of the action. 40 C.F.R. § 1508.27.

122.   Federal agencies must prepare an EIS if substantial questions are raised that the project may cause some significant environmental effects.

123.   Here, the record raised multiple significant questions that the mine expansion may cause significant environmental effects.

124.   The record showed that the mine expansion may result in significant adverse environmental effects and harm to public health from coal combustion and coal transportation.

125.   The record further showed that the mine expansion may impact ecologically critical wetlands, which may not be capable of being mitigated.

126.   The record showed that the impacts to water resources, from coal trains, and from coal combustion are highly controversial, highly uncertain, and involve unknown risks.

127.   Moreover, the record showed that the mine expansion may result in cumulative effects that may cause severe and irreversible damage from greenhouse

gas pollution and non-greenhouse gas pollution from coal combustion, as well as significant cumulative effects to air quality in Montana communities that already fail to meet ambient air quality standards and that are already suffer the burden of some of the worst air pollution in the country.

128.   The record showed that the mine expansion may adversely affect multiple threatened and endangered species, including threatened and endangered salmonids and grizzly bears.

129.   The record also showed that coal trains from the mine would discharge coal into Montana's waters without a lawful discharge permit, in violation of federal law.

130.   Federal Defendants determination that the mine expansion would not have significant environmental impacts was arbitrary and capricious, in violation of NEPA, 42 U.S.C. § 4332(2)(C), and the APA, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION

### (NEPA Violation: Failure to Take a Hard Look at Indirect and Cumulative Effects of Coal Combustion and Coal Transportation)

131.   The Citizens incorporate by reference all preceding paragraphs.

132.   NEPA requires federal agencies' environmental analysis to consider "*any* adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

133.   Agencies are required to take a hard look at direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c).

134.   Direct impacts are "caused by the action and occur at the same place and time." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." *Id.* § 1508.8(b).

135.   Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such actions." *Id.* § 1508.7.

136.   NEPA further requires federal agencies to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(2)(B).

137.   Federal agencies may not trumpet the economic benefits of an action, while ignoring the economic and environmental costs of its action.

138.   Federal agencies may not present misleading economic analyses.

139.   The record showed that air pollution from coal combustion causes premature mortality in the United States, Japan, and Korea. The final EA failed entirely to address mortality caused by coal combustion.

140.   The record showed that air pollution from coal combustion will cost the public billions of dollars in economic harm, exceeding the value of the coal. While the EA included detailed and inflated information about the monetary economic benefits of coal, it misleadingly omitted any account of the economic costs to the public from coal combustion.

141.   The record showed that coal train derailments threaten water resources and aquatic life, including threatened fish species. The EA, however, refused to assess the direct, indirect, and cumulative impacts of coal train derailments.

142.   The record showed that trains strike and kill wildlife, including threatened grizzly bears, along the routes used by the coal trains associated with the Bull Mountains Mine expansion. The EA, however, refused to assess the direct, indirect, and cumulative impacts of coal trains on wildlife and threatened and endangered species.

143.   Federal Defendants failure to assess fully the harmful impacts of coal combustion and coal transportation was arbitrary and capricious in violation of NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. § 706.

28

## THIRD CAUSE OF ACTION

**(NEPA Violation: Failure to Take a Hard Look at Greenhouse Gas Emissions)**

144.   The Citizens incorporate by reference all preceding paragraphs.

145.   NEPA requires federal agencies' environmental analysis to consider "*any* adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

146.   Agencies are required to take a hard look at direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c).

147.   Direct impacts are "caused by the action and occur at the same place and time." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." *Id.* § 1508.8(b).

148.   Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such actions." *Id.* § 1508.7.

149.   NEPA further requires federal agencies to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in

29

decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(2)(B).

150.   Federal agencies may not trumpet the economic benefits of an action, while ignoring the economic and environmental costs of its action.

151.   Federal agencies may not present misleading economic analyses.

152.   The record here showed that the economic impacts of the hundreds of millions of tons of carbon dioxide emissions caused by the mine expansion would cost the public billions of dollars in economic damages, significantly exceeding the total value of the coal.

153.   Federal defendants refused to tell the public the economic costs that the mine expansion into public coal resources would cause to the public.

154.   Federal Defendants trumpeted the economic benefits of the mine expansion. Federal Defendants inflated the value of the coal.

155.   Federal Defendants' misleading economic analysis was arbitrary and capricious in violation of NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. § 706.

**FOURTH CAUSE OF ACTION**

**(NEPA Violation: Failure to Consider Reasonable Alternatives)**

156.   The Citizens incorporate by reference all preceding paragraphs.

157.   NEPA requires federal agencies to consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii).

158.   Agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

159.   In considering alternatives, agencies must "rigorously explore and objectively evaluate all reasonable alternatives," including a "no action" alternative. 40 C.F.R. § 1502.14(a), (d).

160.   Federal Defendants failed to consider reasonable alternatives to the mining plan modification.

161.   Federal Defendants considered only the alternatives of approval and disapproval.

162.   Federal Defendants failed to consider reasonable alternatives, including room and pillar mining and replacing the mine with renewable resources.

163.   Federal Defendants failure to consider adequate alternatives was arbitrary and capricious, and unlawful, in violation of NEPA, 42 U.S.C. § 4332(2)(C), (E), NEPA's implementing regulations, and the APA, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

WHEREFORE, Citizens respectfully request that this Court:

A.   Declare that Federal Defendants' actions violate NEPA and the regulations and policies promulgated thereunder;

31

B.     Vacate and set aside Federal Defendants' action;

C.     Enjoin Federal Defendants from re-issuing or approving the mining plan modification until Federal Defendants have demonstrated compliance with NEPA and the APA;

D.     Enjoin operations in the Amendment AM3 Area until Federal Defendants have demonstrated compliance with NEPA and the APA;

E.     Award Citizens their fees, costs, and other expenses as provided by applicable law;

F.     Issue such relief as Citizens subsequently request or that this Court may deem just, proper, and equitable.

Respectfully submitted this 16th day of January 2019,

/s/ Shiloh S. Hernandez
Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org

Laura H. King
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
king@westernlaw.org

*Attorneys for Plaintiffs*