Shiloh S. Hernandez
Laura H. King
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org
king@westernlaw.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| 350 MONTANA et al., | CV 19-12-M-DWM |
| Plaintiffs, | **BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| DAVID BERNHARDT, et al. | |
| Defendants, | |
| and | |
| SIGNAL PEAK ENERGY, LLC, | |
| Defendant-Intervenor. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ............................................................................ v

ABBREVIATIONS AND SHORT FORMS ...................................................... x

ATTACHMENTS .......................................................................................... xii

INTRODUCTION ........................................................................................... 1

FACTS ............................................................................................................ 2

I.      The Bull Mountains Mine ........................................................................ 2

II.     The Amendment 3 expansion. ................................................................. 2

STANDARD OF REVIEW ............................................................................. 3

ARGUMENT .................................................................................................. 4

I.      Conservation Groups have standing. ....................................................... 4

II.     The Office violated the National Environmental Policy Act. .................. 4

        A.      The Office failed to take a hard look at indirect and
                cumulative impacts of 12,000 coal trains. ..................................... 4

                1.      The Office's refusal to consider the indirect and
                        cumulative impacts of 12,000 coal trains on
                        wildlife was arbitrary. ........................................................ 5

                2.      The Office failed to adequately assess the indirect
                        and cumulative impacts of locomotive emissions
                        from 12,000 coal trains on public health. ......................... 8

                3.      The Office's refusal to assess the impacts of
                        derailments was arbitrary. ............................................... 13

B.    The Office again failed to take a hard look at the effects of over 200 million of tons of GHG emissions from the mine expansion. .......................................................................15

C.    The Office again failed to present a convincing statement of reasons why the impacts of the mine expansion are not significant. ...............................................................................20

    1.    The record showed substantial questions about adverse effects to the environment and to public health. .....................................................................21

    2.    The Office's assessment of uncertainty and controversy was arbitrary and contradictory. ...........................22

    3.    The mine expansion will have significant cumulative impacts from climate change. ...............................24

    4.    The mine expansion threatens to adversely affect endangered species....................................................25

    5.    The mine expansion threatens to cause violations of the Clean Water Act from coal discharges from coal trains. ...........................................................25

III.    The Office violated the Endangered Species Act.........................................27

    A.    The Office's no-effect determination for Grizzly Bears was arbitrary. .......................................................................29

    B.    The Office's no-effect determination for Northern long-eared bats was arbitrary...................................................31

REMEDY ...........................................................................................35

I.    The Court should vacate the Office's approval of the mine expansion. ................................................................................35

II.    The Court should enjoin operations in federal coal in the expansion area pending completion of lawful consultation and preparation of an EIS. .....................................................................36

-iii-

A.  The Office's Endangered Species Act violations warrant
    an injunction. .................................................................................36

B.  The Office's violations of the National Environmental
    Policy Act warrant an injunction.........................................................39

    1.  The mine expansion will cause irreparable harm
        for which there is no adequate remedy at law. .........................39

    2.  Because the harm from the mine expansion will
        dramatically exceed any benefits, the equities
        support an injunction................................................................41

    3.  Enjoining repeated unlawful action is necessary to
        ensure the rule of law. ..............................................................42

CONCLUSION .........................................................................................43

CERTIFICATE OF COMPLIANCE ......................................................44

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Bradford*,
    720 F. Supp. 2d 1193 (D. Mont. 2010) ................................................34

*Alliance for the Wild Rockies v. Kruger*,
    950 F. Supp. 2d 1172 (D. Mont. 2013) ........................................... 28, 32, 33, 35

*Alliance for the Wild Rockies v. Zinke*,
    265 F. Supp. 3d 1161 (D. Mont. 2017) ................................................7

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987) ................................................39

*Cal. Cmties. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) ................................................35

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ................................................34

*Ctr. for Biological Diversity v. BLM*,
    937 F. Supp. 2d 1140 (N.D. Cal. 2013) ................................................ 21, 22, 24

*Found. for N. Am. Wild Sheep v. Dep't of Agric.*,
    681 F.2d 1172 (9th Cir. 1982) ................................................ passim

*Gloucester Res. Ltd. v. Minister for Planning*,
    [2019] NSWLEC 7 (NSW Land & Env't Ct. Feb. 8, 2019) ................................................41

*Great Basin Mine Watch v. Hankins*,
    456 F.3d 955 (9th Cir. 2006) ................................................11

*Great Basin Resource Watch v. BLM*,
    844 F.3d 1095 (9th Cir. 2016) ................................................13

*Helena Hunters v. Tidwell*,
    841 F. Supp. 2d 1129 (D. Mont. 2009) ................................................21

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

*Humane Soc'y v. Dep't of Commerce*,
  432 F. Supp. 2d 4 (D.D.C. 2006) ........................................................ 22, 24, 25

*In re Bull Mountains Mine*,
  No. BER 2016-03 SM (Mont. Bd. of Envtl. Rev. Jan. 14, 2016)........................42

*Indigenous Envtl. Network v. Dep't of State*,
  No. CV-17-29-GF-BMM, 2019 WL 652416 (D. Mont. Feb. 15,
  2019).................................................................................................................42

*Johnston v. Davis*,
  698 F.2d 1088 (10th Cir. 1983) .......................................................................17

*Karuk Tribe v. USFS*,
  681 F.3d 1006 (9th Cir. 2012) .........................................................................29

*League of Wilderness Defenders v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014)............................................................................42

*MEIC v. OSM* (*MEIC I*),
  274 F. Supp. 3d 1074 (D. Mont. 2017)..................................................... passim

*MEIC v. OSM* (*MEIC II*),
  No. CV 15-106-M-DWM, 2017 WL 5047901 (D. Mont. Nov. 3,
  2019)......................................................................................................... passim

*Motor Vehicle Mfrs. v. State Farm*,
  463 U.S. 29 (1983) ......................................................................... 4, 11, 14, 19

*Nat'l Wildlife Fed'n v. NMFS*,
  886 F.3d 803 (9th Cir. 2018)...................................................................... 36, 37

*Nat'l Wildlife Found. v. Harvey*,
  440 F. Supp. 2d 940 (E.D. Ark. 2006) ........................................................ 30, 33

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002).............................................................................30

*Native Ecosystems Council v. USFS*,
  866 F. Supp. 2d 1209 (D. Idaho 2012) ..............................................................26

-vi-

*Native Fish Soc'y v. NMFS*,
    992 F. Supp. 2d 1095 (D. Or. 2014) ............................................................ 22, 24

*NRDC v. USFS*,
    421 F.3d 797 (9th Cir. 2005)...............................................................................15

*Ocean Advocates v. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2004)...................................................................... passim

*Pollinator Stewardship Alliance v. EPA*,
    806 F.3d 520 (9th Cir. 2015)...............................................................................36

*Pub. Serv. Co. of Colo. v. Andrus*,
    825 F. Supp. 1483 (D. Idaho 1993) ....................................................................42

*Riverside Irrigation Dist. v. Andrews*,
    758 F.2d 508 (10th Cir. 1985) ............................................................................30

*Robi v. Five Platters, Inc.*,
    838 F.2d 318 (9th Cir. 1988)........................................................................ 7, 17

*Sierra Club v. BNSF Ry. Co.*,
    No. C13-967-JCC, 2016 WL 6217108 (W.D. Wash. Oct. 25, 2016).................26

*Sierra Club v. USFS*,
    843 F.2d 1190 (9th Cir. 1988) ............................................................. 23, 24, 26

*Swan View Coal. v. Weber*,
    52 F. Supp. 3d 1133 (D. Mont. 2014)................................................................30

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011)................................................................. 4, 27, 29

*WildEarth Guardians v. Dep't of Agric.*,
    795 F.3d 1148 (9th Cir. 2015) .............................................................................4

*WildEarth Guardians v. Jeffries*,
    370 F. Supp. 3d 1208 (D. Or. 2018) ..................................................................33

*WildEarth Guardians v. Zinke*,
　No. CV 17-80-BLG-SPW-TJC, 2019 WL 2404860 (D. Mont. Feb.
　11, 2019) ........................................................................ 5, 17, 18, 20

*Winter v. NRDC*,
　555 U.S. 7 (2008) ..................................................................40

*Zero Zone, Inc. v. Dep't of Energy*,
　832 F.3d 654 (7th Cir. 2016)...................................................18

**Statutes**

16 U.S.C. § 1536 ..................................................... 27, 29, 33

33 U.S.C. § 1311 ..................................................... 25, 26

33 U.S.C. § 1362 ......................................................26

42 U.S.C. § 4332 ................................................. passim

5 U.S.C. § 706 ..................................................... 3, 35

**Regulations**

40 C.F.R. § 1500.1 .................................................. 17, 18

40 C.F.R. § 1502.24 ................................................ 17, 18

40 C.F.R. § 1508.27 ......................................... 21, 22, 24, 25

50 C.F.R. § 402.02 .................................................. 27, 30

50 C.F.R. § 402.12 ......................................................29

50 C.F.R. § 402.14 ......................................................29

80 Fed. Reg. 17,974 (Apr. 2, 2016) .......................... 31, 34, 37

**Rules**

Fed. R. Civ. P. 56 ......................................................3

-viii-

**Other Authorities**

FWS, ESA Consultation Handbook (1998)............................................................30

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

## ABBREVIATIONS AND SHORT FORMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological assessment |
| BLM | U.S. Bureau of Land Management |
| $CO_2$ | Carbon dioxide |
| $CO_2e$ | Carbon dioxide equivalent |
| CWA | Clean Water Act |
| EA | Environmental assessment |
| EIS | Environmental impact statement |
| ESA | Endangered Species Act |
| FONSI | Finding of no significant impact |
| GHG | Greenhouse gas |
| Lbs. | Pounds |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $NO_x$ | Nitrogen oxides |
| Office | U.S. Office of Surface Mining, U.S. Department of Interior, and officer defendants |
| $PM_{2.5}$ | Particulate matter 2.5 micrometers in diameter and smaller |
| $PM_{10}$ | Particulate matter 10 micrometers in diameter and smaller |

-x-

| | |
|---|---|
| Service | U.S. Fish and Wildlife Service |
| Signal Peak | Signal Peak Energy, LLC |
| SO$_2$ | Sulfur dioxide |

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

**ATTACHMENTS**

Attachment 1          Declaration of James Jensen

Attachment 2          Declaration of Carol MacIntyre

Attachment 3          Declaration of Rebecca Fischer

Attachment 4          Declaration of David Mattson, Ph.D.

Attachment 5          Declaration of Paul Smith, D.O.

Attachment 6          Declaration of James Hansen, Ph.D.

Attachment 7          *Gloucester Res. Ltd. v. Minister for Planning*, [2019]
                      NSWLEC 7 (NSW Land & Env't Ct. Feb. 8, 2019)

Attachment 8          *In re Bull Mountains Mine*, No. BER 2016-03 SM (Mont.
                      Bd. of Envtl. Rev. Jan. 14, 2016)

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

**INTRODUCTION**

Flouting this Court's prior ruling, the U.S. Office of Surface Mining, U.S. Department of the Interior, and various directors (collectively, "Office") have again violated the National Environmental Policy Act (NEPA) by:

- refusing to disclose the human and wildlife impacts of 12,000 coal trains traveling from the Bull Mountains Mine to Canada for export;

- misleadingly dismissing as "minor" the impacts of over 200 million tons of GHG pollution from the mine expansion, which will cause between $3 billion and $30 billion in societal harm, exceeding the value of the coal; and

- refusing to prepare an environmental impact statement (EIS) for the mine expansion, despite substantial questions raised by numerous experts and despite the Office's own repeated statements that impacts are controversial and uncertain.

The Office also violated the Endangered Species Act (ESA) by failing entirely to consider the impact of 12,000 coal trains bisecting the habitat of threatened grizzly bears (*Ursus arctos horribilis*) and by erroneously determining that threatened northern long-eared bats (*Myotis septentrionalis*) are not present in the mine area, despite the Office's own prior statements and numerous recent detections of them in the mine area.

-1-

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

This Court should vacate the expansion's approval and enjoin operations in federal coal pending compliance with NEPA and the ESA.

## FACTS

Because of this Court's prior detailed account of the factual background, *MEIC v. OSM* (*MEIC I*), 274 F. Supp. 3d 1074, 1082-1085 (D. Mont. 2017), only an abbreviated description is provided here.

## I.    The Bull Mountains Mine.

The Bull Mountains Mine is an underground longwall coal mine covering nearly 15,000 acres in the Bull Mountains. AR:E-16736, -17038.[1] Signal Peak Energy, LLC (Signal Peak) has operated the mine since 2008, exporting 96% of the coal through the Westshore export terminal in British Columbia, Canada, to Japan and South Korea. AR:E-16751, -17038.

## II.   The Amendment 3 expansion.

In 2012 Signal Peak sought to expand the mine by approximately 7,000 acres, adding 176 million tons of coal. AR:E-17039 to -17040. Because the expansion, called Amendment 3, was checkerboarded with federal coal, it required

---

[1] Citations to the record use the following format: AR:[disc#]-[folder name]-[sub-folder number, if applicable]-[row# for document in Excel index for folder]-[bates#]. Citations to the U.S. Fish and Wildlife Service record use: AR:FWS-[row# in Excel index]-[bates# *or* page# if document lacks bates#]. Citations to errata file (Doc. 32) use: AR:E-[bates#]. Citations to record supplement (*see* Doc. 35) use: AR:Supp-[row# in Excel index]-[bates#].

-2-

the Office to approve a federal mining plan modification. AR:E-16738, -17028.

This Court found the 2015 approval of the expansion violated NEPA by

inadequately disclosing impacts of coal trains and coal combustion and arbitrarily

deciding not to prepare an EIS. *MEIC I*, 274 F. Supp. 3d at 1093-99, 1101-04. The

Court vacated the environmental assessment (EA), partially enjoined operations,

and remanded. *MEIC v. OSM* (*MEIC II*), No. CV 15-106-M-DWM, 2017 WL

5047901 (D. Mont. Nov. 3, 2019). On remand, the Office again issued an EA and a

finding of no significant impact (FONSI), and approved the mining plan

modification. AR:E-16722, -16724, -16729, -17025.

## STANDARD OF REVIEW

A party is entitled to summary judgment if "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). Courts reviewing NEPA claims under the Administrative

Procedure Act (APA) "shall hold unlawful and set aside agency action . . . found to

be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). An agency action is

arbitrary

> if the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency expertise.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

*Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29, 43 (1983). This standard also applies to ESA claims brought under either the ESA or APA. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

## ARGUMENT

## I.     Conservation Groups have standing.

To establish standing a plaintiff must show that (1) concreted injury that is (2) fairly traceable to the challenged conduct, and (3) redressable by a favorable decision. *WildEarth Guardians v. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). Once an organization "seeking to enforce a procedural requirement establish[es] a concrete injury, the causation and redressability requirements are relaxed." *Id.* (internal quotations omitted). An organization has standing to sue when members would have standing in their own right. *Id.*

Here, the Conservation Groups have standing based on the standing of their members. *See* Jensen Decl., ¶¶ 4-14 (attachment 1); MacIntyre Decl., ¶¶ 4-25; (attachement 2); Fischer Decl., ¶¶ 3-19 (attachment 3); *see MEIC I*, 274 F. Supp. 3d at 1086-87 (Mr. Jensen has standing).

## II.    The Office violated the National Environmental Policy Act.

### A.     The Office failed to take a hard look at indirect and cumulative impacts of 12,000 coal trains.

Under NEPA, agencies must consider "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

§ 4332(2)(C)(ii). "These include indirect and cumulative effects." *MEIC I*, 274 F.

Supp. 3d at 1091. When the destinations and routes are known, as here, coal

transportation is a foreseeable indirect effect of coal mining. *Id.* at 1092-93; *accord*

*WildEarth Guardians v. Zinke*, No. CV 17-80-BLG-SPW-TJC, 2019 WL 2404860,

at *7 (D. Mont. Feb. 11, 2019) (proposed findings of magistrate).

> ### 1. The Office's refusal to consider the indirect and cumulative impacts of 12,000 coal trains on wildlife was arbitrary.

Coal trains are a foreseeable indirect effect of the mine expansion. *MEIC I*,

274 F. Supp. 3d at 1092-93; AR:E-16751. The expansion will cause 3.6 trains to

travel to and from the mine each day for nine years, or approximately 12,000 coal

trains during the expansion's nine-year lifespan. AR:E-16786. This will constitute

up to 25% of the train traffic on the rail line in Montana. AR:E-16787.

Cumulatively, coal trains constitute 71% of freight train tonnage in Montana.

AR:E-16760. The Spring Creek strip-mine also ships 550 coal trains annually to

the same export terminal in Canada (4,950 over nine years). AR:Supp-14-17463

(1,164 trains one-way per year, 2,328 total), -17379 (24% of trains export). An

additional 1,752 trains ship coal annually on these lines to coal plants in

Boardman, Oregon, and Centralia, Washington, though those plants close in 2020

and 2025, respectively. AR:2-2019-21-4774 (2.0 and 2.8 trains daily).

There are two train routes to ship coal west through Montana:

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

**Figure 1**: BNSF Routes Westbound to Pacific Northwest Coal Export Terminals. AR:2-2019-260-15446.



Coal trains from the Bull Mountains Mine may use either route, but more are likely to use the southern route. AR:E-16787, -16923. Both routes bisect important wildlife habitat, including grizzly habitat in the Northern Continental Divide, the Cabinet-Yaak, and the Selkirk ecosystems. Trains strike and kill wildlife along the rail line. AR:2-2019-21-4043. Train strikes are a significant source of grizzly mortality on both lines, with more than 35 grizzlies killed in the Northern Continental Divide, at least 3 grizzlies killed from the much smaller, more

-6-

vulnerable Cabinet-Yaak population,[2] and at least 1 grizzly killed from the small Selkirk population. AR:2-2019-344-16591; AR:2-2019-238-12825; AR:2-2019-92-13732; AR:Supp-15-17589. Grizzlies may be drawn to the tracks to forage on carrion (from train strikes), vegetation, and spilled grain. *See* AR:2-2019-21-4481.

Though commenters identified these risks, AR:2-2019-92-13732; AR:2-2019-240-12925; AR:2-2019-68-5336, the Office refused to consider the indirect and cumulative impacts of coal trains on wildlife or listed species beyond the Broadview rail spur, reasoning, with respect to grizzlies, that the "rail line beyond Broadview . . . is not interrelated to or interdependent with the proposed action." AR:E-16925. The Office's argument fails because this Court *already* rejected it and ordered the Office to consider indirect and cumulative impacts of the mine's coal trains "beyond the Broadview spur." *MEIC I*, 274 F. Supp. 3d at 1093; *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) (issue preclusion "prevents relitigation" of an issue that a party has previously litigated to final judgment and lost).

Moreover, while it refused to consider impacts to wildlife, the Office assessed potential impacts of coal trains to other resources along the rail corridor

---

[2] There are fewer than 50 grizzlies in the Cabinet-Yaak. *Alliance for the Wild Rockies v. Zinke*, 265 F. Supp. 3d 1161, 1166 (D. Mont. 2017).

beyond Broadview, *e.g.*, AR:E-16791 (assessing air quality impacts of trains to Missoula), AR:E-16808 (assessing noise and vibration along "rail transport corridor"); *see* AR:E-16839. As this Court explained, such inconsistency is arbitrary. *MEIC*, 274 F. Supp. 3d at 1092; *see Found. for N. Am. Wild Sheep v. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (failure to assess impact of truck traffic from mine on vulnerable sheep herd violated NEPA).

> ## 2. The Office failed to adequately assess the indirect and cumulative impacts of locomotive emissions from 12,000 coal trains on public health.

Along each mile of track, coal trains from the mine expansion will annually emit 1,957 lbs. of $NO_x$, 55 lbs. of $PM_{10}$, and 51 lbs. of $PM_{2.5}$. Numerous communities along the railroad are non-attainment areas, not meeting national ambient air quality standards (NAAQS). AR:2-2019-240-12922.[3] Moreover, in 2017, the American Lung Association ranked the City of Missoula and Ravalli and Lincoln counties among the 25 most polluted cities and counties in the country for short-term $PM_{2.5}$ pollution due to repeated exceedances of air quality standards, AR:Supp-11-17207, -17210, -17211, due in part to climate-change-driven wildfire.

---

[3] This includes Laurel ($SO_x$) East Helena ($SO_x$, lead), Flathead County ($PM_{10}$), Columbia Falls ($PM_{10}$), Whitefish ($PM_{10}$), Missoula ($PM_{10}$), Thompson Falls ($PM_{10}$), and Libby ($PM_{2.5}$). AR:2-2019-240-12922.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

AR:Supp-11-17200; AR:Supp-32-17100. The mine's 12,000 coal trains will worsen these conditions, harming the vulnerable lungs of children most. AR:Supp-13-17057; AR:2-2019-110-6130 ($PM_{2.5}$ concentrations "significantly enhanced" along rail lines). Diesel particulate matter from locomotives is also carcinogenic. AR:E-16837. The Washington Department of Ecology recently found that diesel particulate emissions from coal trains associated with a proposed coal export terminal would significantly increase cancer risk along rail routes, both on their own and cumulatively. AR:2-2019-21-4050, -4825.

//

//

//

//

//

//

//

//

//

//

//

-9-

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

**Figure 2**: Increased cancer risk from particulate matter at proposed Washington coal port and rail line. AR:2-2019-21-4685.



(a)     **Indirect impacts.**

The Office dismissed any impacts from locomotive emissions as

"negligible" because they are supposedly "transitory," AR:E-16791 to -16792, but

-10-

this was arbitrary and counter to the evidence. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Peer-reviewed research shows increased particulate matter levels along rail lines are "not only due to the 'spikes' that occur as a train passes, *but also the residual that accumulates in the local airshed*." AR:2-2019-110-6130 (emphasis added). This accumulation along the tracks can "significantly enhance[]" $PM_{2.5}$ levels and puts some residences "near or over NAAQS." AR:2-2019-110-6130; *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006) (conclusion that "dispersion" would minimize air pollution impacts arbitrary because not "supported by data").

Further, despite its awareness that diesel particulate matter is carcinogenic, the Office arbitrarily failed to address whether these carcinogenic emissions from 12,000 coal trains would increase the cancer risk along the rail line, as the Washington Department of Ecology recently did for a project that would similarly increase coal-train traffic. AR:E-16791 to -16792; AR:E-16846; AR:E-16837; AR:2-2019-21-4050; *Found. for N. Am. Wild Sheep*, 681 F.2d at 1178 (failure to address crucial factor is arbitrary).

Using Missoula as an example, the Office reasoned that despite the non-attainment designation of Montana communities along the tracks (primarily for $PM_{10}$), the communities "are likely to have developed mitigation measures" to improve air quality. AR:E-16791. The Office's wishful thinking is simply

-11-

inaccurate. While Missoula may not have recorded air quality violations for $PM_{10}$ since 1989, AR:E-16835 to -16836, the severity and frequency of recent air quality violations for $PM_{2.5}$ due to climate-change-worsened wildfires has caused Missoula and Ravalli and Lincoln counties to have some of the worst air quality in the nation. AR:Supp-11-17207, -17210, -17211. The $PM_{2.5}$ emissions from the 12,000 coal trains from the Bull Mountains Mine expansion will worsen this already-unhealthy air, AR:Supp-13-17057, as will the 240 million of tons of GHG emissions from coal combustion, by worsening climate change and intensifying wildfires. AR:Supp-32-17100; AR:E-16793. The Office's failure to consider the current air quality violations for $PM_{2.5}$ was arbitrary. *Found. for N. Am. Wild Sheep*, 681 F.2d at 1178.

### (b)   Cumulative impacts

Worse, though the record showed that many Montana communities along the tracks have unhealthy air, which the additional trains would worsen, the Office failed entirely to consider the cumulative impacts of locomotive emissions from the 12,000 coal trains—instead, the agency addressed cumulative impacts of coal dust. AR:E-16792 to -16793; AR:E-16851; *cf.* AR:2-2019-21-4825 (Washington Department of Ecology concluding that cumulative effect of locomotive emissions would increase cancer rates along tracks). Nor did the Office address the cumulative train emissions, including the thousands of other trains shipping coal

-12-

annually to the same coal port and coal plants in Oregon and Washington.

AR:Supp-14-17463, -17379; AR:2-2019-21-4774. These omissions were arbitrary.

*Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1105 (9th Cir. 2016)

(cumulative air quality analysis insufficient for failing to "quantify or discuss in

any detail the effects of other activities" that could "potentially affect air

resources").

### 3.     The Office's refusal to assess the impacts of derailments was arbitrary.

The Office also refused, as speculative, to assess impacts from coal train

derailments. AR:E-16949. But, as this Court explained, "reasonable forecasting

and speculation is implicit in NEPA." *MEIC I*, 274 F. Supp. 3d at 1092 (internal

bracket, ellipse, and quotation omitted). Here, the record demonstrates that train

accidents occur with predictable regularity (approximately 2.3 accidents per

1,000,000 train miles). AR:2-2019-21-4528. Given that the Office calculated the

anticipated number of trains from the mine expansion (3.6 per day) and the number

of rail miles for each trip (1,390), AR:E-16752, -16786, it could have predicted the

number of rail accidents (3.6 trains x 365 days x 1,390 miles per train x 2.3

accidents/1,000,000 miles = 4.2 accidents per year), similar to its quantification of

air pollution. *See* AR:E-16861 to -16862.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

Further, according to the Washington Department of Ecology, coal train derailments "could have potentially substantial impacts on water quality." AR:2-2019-21-4790; *see* AR:2-2019-241-12973 to -12974 (coal spill along and into Clark Fork River that caught fire); AR:Supp-13-17059 (noting prior derailments and toxic releases in Montana).

**Figure 3:** Image of 2017 derailment near Heron, Montana. AR:Supp-16-17595.



Because the Office could have analyzed impacts of coal-train derailments and such impacts could be significant, its complete failure to assess derailments was arbitrary. *Motor Vehicle Mfrs.*, 463 U.S. at 43; *see Ocean Advocates v. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2004) (agency failed to adequately analyze the impacts of increased oil tankers due to refinery dock addition, which would "elevate[] the risk of oil spills").

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

**B.      The Office again failed to take a hard look at the effects of over 200 million of tons of GHG emissions from the mine expansion.**

"NEPA represents a firm Congressional mandate that environmental factors be considered *on an equal basis* with other, more traditional, concerns." *Found. for N. Am. Wild Sheep*, 681 F.2d at 1177 (emphasis added); 42 U.S.C. § 4332(2)(B). Accordingly, a misleading economic analysis violates NEPA. *NRDC v. USFS*, 421 F.3d 797, 811-12 (9th Cir. 2005). Consistent with this longstanding precedent, this Court previously held that the Office violated NEPA by quantifying the benefits but not the costs of this mine expansion. *MEIC I*, 274 F. Supp. 3d at 1098. The Office improperly placed its "thumb on the scale by inflating the benefits of the action while minimizing its impacts," and could not "persuasively justify" its "failure to consider the cost of greenhouse gas emissions." *Id.* at 1098-99. On remand, the Office again unlawfully inflated the economic benefits of the expansion, while "zero[ing]" the enormous costs of GHG emissions. *Cf. id.* at 1104. The Office's litany of excuses for again repeating this error lacks merit.

Mining, shipping, and burning the remaining 109 million tons of coal in the expansion area will cause 240 million tons of carbon dioxide equivalent ($CO_2e$) emissions. AR:E-16793. The Office concluded that the impact of these emissions would be "minor" because they represent only 0.44% of annual global GHG emissions. AR:E-16794. Yet the Office refused to disclose that according to the

-15-

social cost of carbon protocol—the best available science for assessing the *actual effects* of GHG pollution—the expansion's 240 million tons of $CO_2e$ will cause the public between $3 billion and $32 billion in climate-change-related harm (from $29 to $296 per ton of coal), exceeding the total value of the coal ($24 per ton), AR:Supp-18-17084 to -17085, and the identified economic benefits of the expansion, $1.39 billion in revenue, AR:E-16810.[4] This one-sided disclosure of economic benefits and simultaneous zeroing of environmental costs was misleading (in fact, the expansion has net negative value), *MEIC I*, 274 F. Supp. 3d at 1098-99, and contrary to NEPA's mandate to consider "environmental factors . . . on an equal basis with other, more traditional, concerns." *Found. for N. Am. Wild Sheep*, 681 F.2d at 1177.

The Office's attempt to re-litigate two excuses rejected before—i.e., that it did not have to use the social cost of carbon because this was not a rulemaking and that NEPA does not mandate cost-benefit analysis, AR:E-16883, *but see MEIC*,

---

[4] When the harm from non-greenhouse gas emissions is included ($67 per ton), the total "total monetized damages of the coal would be $95-350 per ton of coal, dwarfing the estimated $24 per ton current economic value of the coal." AR:2-2019-92-13395.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

274 F. Supp. 3d at 1095-96[5]—is barred by collateral estoppel. *Robi*, 838 F.2d at 322.

The Office also errs in contending it was not required to use the social cost of carbon because the current administration disbanded the Interagency Working Group that developed the tool and withdrew the underlying technical documents. AR:E-16881. However, an administration's decision to ignore science does not alter NEPA's mandate of science-based decisionmaking. 42 U.S.C. § 4332(2)(A); 40 C.F.R. §§ 1500.1(b), 1502.24. Indeed, for this reason, Magistrate Judge Cavan rejected the same argument: "Regardless of administration policies that ebb and flow with political tides, agencies must nevertheless comply with their obligation to properly quantify costs when they have touted the economic benefits of a proposed action." *WildEarth*, 2019 WL 2404860, at *12 n.7; *see Johnston v. Davis*, 698 F.2d 1088, 1092-95 (10th Cir. 1983) (even though Congress required use of unrealistic discount rate to assess economic viability of water project, agency violated NEPA by failing to disclose that under a realistic discount rate project was uneconomical).

---

[5] *Accord High Country Conservation Advocates v. USFS*, 52 F. Supp. 3d 1174, 1192 (D. Colo. 2014); *WildEarth*, 2019 WL 2404860, at *10.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

Moreover, there was *no scientific basis* for the administration's disbanding the working group and withdrawing its technical documents. *See* E.O. 13783. Thus, the working group's "social cost of greenhouse gas estimates remain the best available assessments for federal agencies to use in evaluating climate impacts." AR:2-2019-93-5529.[6] The Office did not dispute this. *See* AR:E-16881 to -16882. Indeed, if anything, the social cost of carbon is too conservative, i.e., too low, because it omits significant damages and potential irreversible and catastrophic impacts. AR:2-2019-93-5531 to -5541, -5549 & n.46 (noting research that social cost of carbon should be $200 per ton or more). Accordingly, the administration's political maneuvering cannot defeat NEPA's mandate of science-based decisionmaking and does not excuse the Office's refusal to treat environmental costs on equal basis with economic benefits. 42 U.S.C. § 4332(2)(A); 40 C.F.R. §§ 1500.1(b), 1502.24; *WildEarth*, 2019 WL 2404860, at *12 n.7.

The Office's final excuse for not using the social cost of carbon is that such analysis would be "potentially inaccurate" because "the full social-benefits of coal-

---

[6] *See* AR:2-2019-96-5604 (statement of Professor Michael Greenstone that "[t]o date, the IWG's SCC protocol is the most rigorously scrutinized and widely used estimation of the marginal costs of climate change"); AR:2-2019-32-2800 (widespread use of social cost of carbon); AR:2-2019-96-5605 (same); *Zero Zone, Inc. v. Dep't of Energy*, 832 F.3d 654, 677-79 (7th Cir. 2016) (upholding social cost of carbon).

fired energy production have not been monetized." AR:E-16883. This argument

fails for three principal reasons. First, it is mistaken because the Office *did*

include—and in fact inflated[7]—the economic benefits of the expansion. AR:E-

16809 to -16810 (detailing economic benefits); *accord* AR:E-16908 to -16914; *see*

*WildEarth*, 2019 WL 2404860, at *11-12 (rejecting identical argument because

"OSM did in fact attempt to quantify benefits of the proposed action").

Furthermore, there is "*no peer-reviewed economic literature* documenting the

social benefits of coal combustion and the resultant pollutants released. Absent

economic evidence to the contrary, the competitive market mine mouth coal price

[$24 per ton] reflects the full economic benefit of the proposed coal mining."

AR:2-2019-92-13456 to -13457 (emphasis added).[8]

Finally, the Office's assertion that quantifying the pollution impacts of coal

would be inaccurate or misleading "runs counter to the evidence." *Motor Vehicle*

*Mfrs.*, 463 U.S. at 43. While the Office's economic assessment indicated the

overall economic benefits of the mine expansion would be substantial, AR:E-

---

[7] The Office assumed the coal would sell for $32.50 per ton. AR:E-16913 to -16914. This inflated its value by 25%. AR:Supp-18-17085. The prior EA used a value of $11.79 per ton. *MEIC I*, 274 F. Supp. 3d at 1096. Thus, the revised EA increased that figure by approximately *300%.*

[8] *Accord* AR:2-2019-93-5526 to -5527.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

16913 to -16914, the scientific studies compiled in the record showed the exact

opposite, i.e., that the costs of the expanded coal mining would dramatically

outweigh the benefits. *E.g.*, AR:2-2019-23-2743 ("[T]he monetized climate

damages from PRB [Powder River Basin] coal combustion are about six times the

spot price of coal."); AR:2-2019-32-2795 (damages from coal eight times value of

coal); AR:2-2019-132-7016 (external costs exceed value of coal); AR:Supp-18-

17083 (same).[9]

In sum, by again "plac[ing] [its] thumb on the scale by inflating the benefits

of the action while minimizing its impacts," the Office violated NEPA. *MEIC I*,

274 F. Supp. 3d at 1098; *WildEarth*, 2019 WL 2404860, at *12.

### C. The Office again failed to present a convincing statement of reasons why the impacts of the mine expansion are not significant.

Federal agencies must prepare an EIS for any "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C). "An EIS *must* be prepared if substantial questions are raised as to

whether a project *may* cause significant degradation of some human environmental

factor." *Ocean Advocates*, 402 F.3d at 864 (internal quotation, ellipsis, and bracket

---

[9] *See* AR:Supp-18-17091 to -17096 (collecting peer-reviewed studies showing
exorbitant costs from mortality and morbidity from coal).

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

omitted). If an agency opts not to prepare an EIS, and issues a FONSI, "[t]he FONSI must contain a convincing statement of reasons why the project's impacts are insignificant." *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1153 (N.D. Cal. 2013) (internal quotation omitted). A FONSI that makes "conclusory assertions" is insufficient to "avoid preparing an EIS." *Ocean Advocates*, 402 F.3d at 864.

To determine significance, agencies must consider the context and intensity of the proposed action. 40 C.F.R. § 1508.27(a)-(b). To assess the intensity, agencies address a non-exclusive list of factors. *Id.* § 1508.27(b). The presence of "one of these factors may be sufficient to require preparation of an EIS." *Ocean Advocates*, 402 F.3d at 865. If the EA or record contradicts the conclusions in the FONSI, the "conclusion that the . . . impacts will not be significant is arbitrary." *Helena Hunters v. Tidwell*, 841 F. Supp. 2d 1129, 1136 (D. Mont. 2009).

Here, multiple factors raise substantial questions, requiring an EIS.

> **1.    The record showed substantial questions about adverse effects to the environment and to public health.**

As noted, the record contains substantial expert information indicating that air pollution from coal trains will worsen unhealthy air along the rail line and increase cancer rates and that the GHG emissions will cause damages exceeding the value of the coal, *see supra* Part II.A.2, II.B. Because the Office failed to

-21-

adequately assess these impacts, it has not presented a convincing statement as to why these impacts are not significant. *MEIC I*, 274 F. Supp. 3d at 1103-04; 40 C.F.R. § 1508.27(b)(1)-(2) (adverse impacts and public health).

> ### 2. The Office's assessment of uncertainty and controversy was arbitrary and contradictory.

If there are substantial questions about whether the effects of a project are "highly controversial" or "highly uncertain," an agency must prepare an EIS. 40 C.F.R. § 1508.27(b)(4), (5); *Ocean Advocates*, 402 F.3d at 865. "A federal action is controversial if a substantial dispute exists as to its size, nature, or effect." *MEIC I*, 274 F. Supp. 3d at 1102 (internal quotation and bracket omitted). "If evidence is raised prior to the preparation of the FONSI that casts serious doubt upon the reasonableness of an agency's conclusions, then the burden shifts to the agency to demonstrate why those responses do not create a public controversy." *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1157-58 (N.D. Cal. 2013) (internal quotation omitted).

It is arbitrary for an agency to repeatedly identify uncertainty in the administrative record, yet ignore that uncertainty in a FONSI. *Native Fish Soc'y v. NMFS*, 992 F. Supp. 2d 1095, 1109 (D. Or. 2014); *Humane Soc'y v. Dep't of Commerce*, 432 F. Supp. 2d 4, 21 (D.D.C. 2006). "[A]ffidavits and testimony of conservationists, biologists, and other experts who [are] highly critical of the EAs

and dispute[] the [agency's] conclusion that there would be no significant effects"
can establish that an action is controversial and uncertain. *Sierra Club v. USFS*,
843 F.2d 1190, 1193-94 (9th Cir. 1988).

Here, highly qualified academics, physicists, economists, and physicians
disputed the Office's conclusion that the pollution from trains and coal combustion
from the expansion would be insignificant. *E.g.*, AR:2-2019-92-13362 (statement
by James Hansen, Ph.D., of significant climate impacts); AR:2-2019-93-5528
(statement by multiple experts of significant climate impacts when monetized);
AR:2-2019-96-5601 to -5614 (statement of Michael Greenstone, Ph.D., about
monetizing climate impacts); AR:Supp-18-17096 (statement of Thomas Power,
Ph.D., that monetized air pollution impacts "dwarf[]" value of coal); AR:Supp-17-
17063 (statement of Brian Moench, M.D., of significant air pollution impacts);
AR:Supp-13-17057 (statement of Paul Smith, D.O., of significant coal train
pollution). These statements raised substantial questions whether impacts may be
significant, triggering the EIS requirement. *Ocean Advocates*, 402 F.3d at 864.

The Office, in turn, either did not respond to these expert declarations, *e.g.*,
AR:E-16975 (no response to Dr. Hansen); AR:E-16971 (non-response to Dr.
Moench), or dismissed them as controversial or uncertain. *E.g.*, AR:E-16882 to -
16956 (calling air pollution impacts "uncertain" a dozen times); AR:E-16728
(dismissing social cost of carbon by citing coal consultant who controverted it);

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

AR:E-16974 to -16975 (responding to Dr. Power by asserting uncertainty about costs of non-GHG emissions); AR:E-16970 (responding to Dr. Smith that derailments are "speculative"). This demonstrated, at minimum, that "[t]his is precisely the type of 'controversial' action for which an EIS must be prepared." *Sierra Club*, 843 F.2d at 1193-94; *accord Ctr. for Biological Diversity*, 937 F. Supp. 2d at 1157-58. Moreover, the Office's repeated assertions of uncertainty and controversy about impacts plainly contradict the FONSI's conclusory statements that no impacts are "highly controversial" or "highly uncertain," which was arbitrary. *Native Fish Soc'y*, 992 F. Supp. 2d at 1109; *Humane Soc'y*, 432 F. Supp. 2d at 21.

### 3.    The mine expansion will have significant cumulative impacts from climate change.

An EIS may also be warranted if an action may have "cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). The expansion's 240 million tons of GHGs will contribute to climate change. The Office's EA admitted that cumulatively, "[c]ontinued emission of GHGs will cause further warming and long-lasting changes in all components of the climate system, including the likelihood of *severe, pervasive, and irreversible impacts for people and ecosystems*." AR:E-16879 (emphasis added). The FONSI, however, made the conclusory statement that "[t]here were no significant cumulative effects

identified." AR:E-16728. The FONSI's conclusion cannot be squared with the

EA's statement of cumulatively significant impacts, rendering the FONSI arbitrary.

*Humane Soc'y*, 432 F. Supp. 2d at 21-22 (conclusory statement in FONSI arbitrary

for failing to acknowledge potentially significant cumulative impacts identified in

EA).

### 4. The mine expansion threatens to adversely affect endangered species.

An EIS may also be warranted if there are substantial questions about

whether the proposed action "may adversely affect an endangered or threatened

species." 40 C.F.R. § 1508.27(b)(9). Here, coal trains may adversely affect

grizzlies, and the mining operation may adversely affect northern long-eared bats.

*See supra* Part II.A.1; *see infra* Part III.B. This also militates in favor of an EIS.

### 5. The mine expansion threatens to cause violations of the Clean Water Act from coal discharges from coal trains.

An action may also be significant if it "threatens a violation of Federal"

environmental law. 40 C.F.R. § 1508.27(b)(10). Here, the 12,000 coal trains from

the mine expansion threaten to violate the Clean Water Act (CWA), 33 U.S.C.

§ 1311(a), by discharging pollution into waters of the United States without a

permit. Coal train cars are point sources and "coal particles allegedly discharged by

BNSF trains that travel adjacent to and above the waters at issue are point source

-25-

discharges." *Sierra Club v. BNSF Ry. Co.*, No. C13-967-JCC, 2016 WL 6217108, at *9 (W.D. Wash. Oct. 25, 2016); 33 U.S.C. § 1362(14) ("point source" includes "container" and "rolling stock"). If dust-control measures are taken, each loaded coal train can still lose 750 lbs. of coal dust over each 100 miles it travels.[10] Thus, assuming dust control measures are taken, the 1.8 loaded coal trains traveling from the mine daily will deposit approximately three-quarters of a ton of coal along each 100 mile section of track every day for 9 years.

The Office recognized that some of this coal would discharge into surface water, AR:E-16846; AR:2-2019-263-16075, and that the trains do not have permits to discharge coal into water. AR:E-16924. Thus, the discharges will violate the CWA. 33 U.S.C. § 1311(a). Such threatened violation of federal environmental law requires preparation of an EIS. *Sierra Club*, 843 F.2d at 1195; *Native Ecosystems Council v. USFS*, 866 F. Supp. 2d 1209, 1231 (D. Idaho 2012).

In sum, because (1) the record shows the mine expansion may cause significant impacts, and (2) the Office offered no convincing reasons why such impacts would not be significant, the decision not to prepare an EIS was unlawful.

---

[10] AR:E-16838 (treated car can lose 6 lbs. over 100 miles); AR:E-16861 (125 cars per train). If untreated, a single car can lose 500 lbs. of coal dust. *E.g.*, AR:2-2019-112-6174.

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

### III.    The Office violated the Endangered Species Act.

"The heart of the ESA is section 7(a)(2), 16 U.S.C. § 1536(a)(2)," which

requires agencies to consult with the U.S. Fish and Wildlife Service (Service) to

"insure that any action authorized" by an agency is not likely to "jeopardize the

continued existence" of listed species. *W. Watersheds*, 632 F.3d at 495. The first

step is to determine if any listed species "may be present" in the "action area." 16

U.S.C. § 1536(c)(1). The action area is broadly defined to include "all areas to be

affected directly or indirectly by the Federal action and not merely the immediate

area involved in the action." 50 C.F.R. § 402.02. Indirect effects are "those that are

caused by the proposed action and are later in time, but still are reasonably certain

to occur." *Id.*

//

//

//

//

//

//

//

//

Pls.' Br. in Spt. of MSJ

350 MT v. Bernhardt, CV 19-12-M-DWM

**Figure 4**: "Example of an action area involving an effect not at the project site." FWS, ESA Consultation Handbook, at 4-17 (1998).



A species "may be present" even if the species is not "actually known or believed to occur" in the action area. *Alliance for the Wild Rockies v. Kruger*, 950 F. Supp. 2d 1172, 1184 (D. Mont. 2013). If a listed species "may be present" in the action area, the action agency (here, the Office) must prepare a biological

-28-

assessment (BA) to determine whether the action "may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1). If the action "may affect" a listed species, the action agency must consult with the Service. "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character," triggers the requirement to consult. *W. Watersheds*, 632 F.3d at 496 (citations omitted). Only if the action agency determines an action will have "no effect" on listed species, "may [it] avoid the consultation requirement." *Karuk Tribe v. USFS*, 681 F.3d 1006, 1027 (9th Cir. 2012). Consultation must be guided by the best available science. 16 U.S.C. § 1536(a)(2).

### A. The Office's no-effect determination for Grizzly Bears was arbitrary.

As noted, the Office arbitrarily ignored impacts to wildlife beyond the rail spur at Broadview, arguing that the track beyond that point has "independent utility." AR:E-16925; *see supra* Part II.A. Whether the track beyond Broadview has independent utility is irrelevant, because the 12,000 coal trains traveling from the mine are a foreseeable indirect effects, as the Office recognized. AR:E-16786 to -16789. The two train routes bisect grizzly habitat in the Northern Continental Divide, Cabinet-Yaak, and Selkirk ecosystems. AR:2-2019-260-15446. Trains are one of the leading sources of grizzly mortality in these ecosystems. AR:FWS-34-6;

AR:FWS-36-16; AR:FWS-37-1; AR:FWS-31-17; AR:FWS-32-2; *see generally* AR:FWS-30-1 to -390 (reporting dozens of train moralities in Northern Continental Divide Ecosystem); Mattson Decl., ¶ 8 (train strikes 9% of grizzly mortality in Northern Continental Divide and Cabinet-Yaak ecosystems). This meets the "low threshold" for a "may affect" determination. *Swan View Coal. v. Weber*, 52 F. Supp. 3d 1133, 1145 (D. Mont. 2014).

The Office violated section 7 by failing entirely to consider the foreseeable indirect effects of coal trains and failing to include areas indirectly affected by the trains in the action area. 50 C.F.R. § 402.02 (defining action area and effects to include indirect effects); *see* FWS, ESA Consultation Handbook, at 4-29 (1998) (noting that if a dam were to cause consumptive use of water that would indirectly impact "critical habitat for whooping cranes 150 miles away," agency must consider those impacts "in addition to local impacts of placing fill for the dam." (citing *Riverside Irrigation Dist. v. Andrews*, 758 F.2d 508 (10th Cir. 1985)); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902-03 (9th Cir. 2002) (arbitrary for agency to limit action area without scientific justification).[11]

---

[11] *Accord Nat'l Wildlife Found. v. Harvey*, 440 F. Supp. 2d 940, 956-57 (E.D. Ark. 2006) (agencies violated ESA by failing to "take into account areas that are indirectly affected by" action).

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

**B.    The Office's no-effect determination for Northern
long-eared bats was arbitrary.**

Northern long-eared bats are small bats with large wings, and with dark-brown fur on the back and tawny to pale-brown fur on the ventral side. 80 Fed. Reg. 17,974, 17,975 (Apr. 2, 2016). They are distinguished by their relatively long ears. *Id.* Their range once reached "from Maine west to Montana," *id.*, though "there has been limited survey effort throughout much of [the western portion] of the species' range." *Id.* at 17,983. However, since the appearance of white-nose syndrome in New York in 2006, the species has suffered "unprecedented mortality" of approximately 96% in the Northeast. *Id.* at 17,994-95, 17,999-800. Similar declines are occurring as the disease spreads through the Midwest and, eventually, the entire species range in the next 8-13 years. *Id.* at 18,000. White-nose syndrome has not yet spread to Montana, *id.* at 17,994, which may yet be a refuge.

Subsidence from coal mining is a "direct threat to northern long-eared bat." *Id.* 17,898. The Office, however, determined the mine expansion would have "no effect" on northern long-eared bats based on "no species present and lack of suitable habitat" in the mine area. AR:2-2019-353-16583. The Office's determination runs counter to the evidence and the best available science, both of

which "raise a possibility that [the bat] may be present." *Kruger*, 950 F. Supp. 2d at 1183-84:

- Northern long-eared bats were detected in the mine area in 2006, when it was "surveyed more intensively" by consultants for Signal Peak, AR:E-16775; AR:2-2019-160-9758;

- The Bureau of Land Management's (BLM) EA for the coal lease in 2011—which the Office incorporated by reference, AR:E-16738—reported northern long-eared bats in the project area, AR:2-2019-255-14203;

- Over 100 bat calls collected from the mine area from 2015-2018 by state agencies were auto-identified by bat-call analysis software as likely having been produced by northern long-eared bats, AR:FWS-27-10 to -15 (recording stations at mine labeled "SIGPK" for Signal Peak, "Myse" denotes Northern long-eared bat (*Myotis septentrionalis*)); and

- Expert analysis of the 2015-2018 bat-call files confirmed northern long-eared bats were in the mine area in July of 2015, August of 2015, August of 2017, and May of 2018, AR:FWS-28-1 to -2.

-32-

These multiple lines of evidence, including statements by the Office and Signal Peak's consultants, demonstrate that northern long-eared bats "may be present" in the action area. 16 U.S.C. § 1536(c)(1); *Kruger*, 950 F. Supp. 2d at 1183-84; *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1231 (D. Or. 2018) (multiple reports by agency and contractors demonstrated wolves may be present).

The Office's reasoning to the contrary lacks merit. The Office asserted that no survey, beside the 2006 survey, documented observations of the bat "between the years 1989 and 2016." AR:2-2019-353-16583. This is mistaken first because the numerous acoustic recordings from the mine area between 2015 and 2018 were auto-identified as potential northern long-eared bat calls and some were later confirmed by experts as northern long-eared bat calls. AR:FWS-27-10 to -15; AR:FWS-28-1 to -2. Equally important, most of the wildlife monitoring reports (2006 excepted) only assessed bats at the *genus* level ("myotis") or by frequency range groups, not at the *species* level. AR:1-2016-2-351-9340, -9345 (grouping calls by low, moderate, and high frequency and noting "many *Myotis* species" in high frequency class); AR:2-2019-287-16372, -16378; AR:1-2016-2-340-9013, -9050; AR:1-2016-2-342-9116, -9151; AR:1-2016-2-344-9215, -9246. It was arbitrary for the Office to base its determination on analyses that were not designed to detect the species. *Harvey*, 440 F. Supp. 2d at 957 (E.D. Ark. 2006) (inadequate search for ivory billed woodpecker). Moreover, the Office knew that state agencies

-33-

were also recording bat activity in the mine area. AR:2-2019-289-16406. Had the Office obtained and reviewed those acoustic recordings at a species level, it would have detected northern long-eared bats. AR:FWS-28-1 to -2. Its failure to do so was unlawful. *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (agency "cannot ignore available biological information").

The Office's assertion that the action area is outside the "known and predicted range" of the bat is also mistaken, because it ignores the best available science—the species level acoustic analyses from the "more intensive[e]" survey in 2006 and from 2015-2018 from the mine area—that detected northern long-eared bats. AR:FWS-28-1 to -2; AR:E-16775; AR:2-2019-160-9758. Moreover, as the listing rule explained, only "limited survey effort[s]" for this species have occurred in the West. 80 Fed. Reg. at 17,983. It was arbitrary for the Office to discount recent species-level information from the mine area—including prior statements by the Office and BLM—on the basis of general assertions about species range. *Conner*, 848 F.2d at 1454; *Alliance for the Wild Rockies v. Bradford*, 720 F. Supp. 2d 1193, 1212-15 (D. Mont. 2010) (agency's inconsistent statements on presence of grizzlies arbitrary).

Finally, the Office is also mistaken in its assertion that "inadequate suitable habitat" for northern long-eared bats exists in the mine area, AR:2-2019-353-16583. In fact, the species is "commonly captured" and "abundant" in "areas

-34-

dominated by contiguous Ponderosa Pine forest," in the Black Hills of South

Dakota, and the Bear Lodge Mountains of northeastern Wyoming. AR:FWS-26-2

to -4. The Bull Mountains have "ponderosa pine and Rocky Mountain juniper

forests," AR:E-16772, and are the northern end of the Pine Breaks region that

"extend[s] roughly from the Musselshell River in central Montana to the western

foothills of the Black Hills." AR:1-2016-2-363-9440.

In sum, the Office's no effect determination—along with the Service's

supposed telephonic concurrence[12]—ran counter to the evidence and the best

available science, in violation of the ESA and APA. *Kruger*, 950 F. Supp. 2d at

1183-84.

## REMEDY

## I.      The Court should vacate the Office's approval of the mine expansion.

Absent exceptional circumstances, "[v]acatur is the standard remedy for

violation of the APA." *California v. BLM*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal.

2017); 5 U.S.C. § 706(2)(A). Remand without vacatur is only ordered in "limited

circumstances," *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir.

2012), when a court determines in equity that the disruptive consequences of

---

[12] AR:2-2019-351-16607; *but see Kruger*, 950 F. Supp. 2d at 1184 (Service's
concurrence "cannot override" requirements of ESA).

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

vacatur outweigh the seriousness of the agency's error. *Pollinator Stewardship Alliance v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

Here, the Office's continued refusal to tell the public the truth about the magnitude of harm from the mine expansion "lies at the heart of NEPA's requirement that agencies make informed decisions." *MEIC II*, 2017 WL 5047901, at *6. The harm from continued mining outweighs any disruptive consequences of any cessation of active mining operations. *See infra* Remedy Part II.A-B. The Court should vacate the decisions.

## II.    The Court should enjoin operations in federal coal in the expansion area pending completion of lawful consultation and preparation of an EIS.

To obtain a permanent injunction a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018) (internal quotation omitted).

### A.    The Office's Endangered Species Act violations warrant an injunction.

"The ESA removes the latter three factors in the four-factor injunctive relief test from [courts'] equitable discretion." *Id.* For injunctive relief under the ESA, a

-36-

plaintiff need only demonstrate a likelihood of irreparable injury. *Id.* at 817-18. Here, the 12,000 coal trains from the mine expansion will irreparably harm grizzlies in the Northern Continental Divide, Cabinet-Yaak, and Selkirk ecosystems: "Additional train traffic will almost certainly result in more grizzly bears being killed, displaced, and impeded than would otherwise be the case." Mattson Decl., ¶¶ 15-17 (attachment 4). Continued mining also threatens northern long-eared bats. 80 Fed. Reg. 17,989. This warrants an injunction. *Nat'l Wildlife Fed'n*, 886 F.3d at 818-19.

//

//

//

//

//

//

//

//

//

//

//

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM



**Figure 5:** Grizzly deaths along rail line 1997-2018. Mattson Decl., app. 2 at 4.

//

//

//

//

//

//

//

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

**Figure 6**: Train-strike mortality. Mattson Decl., app. 2 at 21.



**B.**   **The Office's violations of the National Environmental Policy Act warrant an injunction.**

**1.**   **The mine expansion will cause irreparable harm for which there is no adequate remedy at law.**

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

Here, once the coal is mined and the land subsides, it cannot be undone. *MEIC II*,

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM

2017 WL 5047901, at *3. Similarly, harm from air pollution from coal trains, especially to children, and harm to wildlife from train strikes is permanent and cannot be replaced with money. Mattson Decl., ¶¶ 15-17; Smith Decl., ¶¶ 10, 18-19 (attachment 5); Jensen Decl., ¶¶ 17-18.

Finally, the worsening of climate change from burning this coal is irreparable; indeed, it is existential. As stated by Dr. James Hansen: "[A]dditional mining of coal at Bull Mountain would be contrary both to the fundamental interests of humanity in restoring planetary energy balance and to the interests of persons in Montana who yearn to breathe air that is not heavily laden with smoke and ash." AR:2-2019-92-13357. Unabated climate change threatens national security and threatens to place unbearable burdens on young people and future generations. Hansen, Decl., at 8-11 & n.14 (attachment 6); *see Winter v. NRDC*, 555 U.S. 7, 33 (2008) (equities strongly tip toward national security).

Recently, the Land and Environment Court of New South Wales, Australia—relying in part on this Court's prior decision—rejected a coal mine proposal for similar reasons:

> The Project will be a material source of GHG emissions and contribute to climate change. Approval of the project will not assist in achieving the rapid and deep reductions in GHG emissions that are needed now in order to balance emissions by sources with removals by sinks of GHGs in the second half of this century and achieve the generally agreed goal of limiting the increase in global average temperature to well below 2°C above pre-industrial levels.

-40-

. . . .

In short, an open cut coal mine in this part of the Gloucester valley
would be in the wrong place at the wrong time . . . . because the GHG
emissions of the coal mine and its coal product will increase global
total concentrations of GHGs at a time when what is now urgently
needed, in order to meet generally agreed climate targets, is a rapid
and deep decrease in GHG emissions. These dire consequences should
be avoided. The Project should be refused.

*Gloucester Res. Ltd. v. Minister for Planning*, [2019] NSWLEC 7, at ¶¶ 697, 699

(NSW Land & Env't Ct. Feb. 8, 2019) (attachment 7); *see id.* at ¶ 507 (citing

*MEIC I*). So too here.

**2.   Because the harm from the mine expansion will
dramatically exceed any benefits, the equities
support an injunction.**

Applying widely accepted metrics of valuation from environmental

economics demonstrates the harm from continued coal combustion outweighs the

benefits of the expansion. "[T]he total monetized damages of the coal would be

$95-$350 per ton of coal, dwarfing the estimated $24 per ton current economic

value of the coal." AR:2-2019-92-13465; *accord MEIC II*, 2017 WL 5047901, at

*5-6 (noting monetized damages from expansion outweigh benefits).

Moreover, while the mine provides employment, the Office recognized that

such employment is only temporary and will end when the coal is exhausted or

markets change. AR:E-16810. State regulators have repeatedly warned that the

mine's boom-and-bust cycle will cause "major and long-term impacts over the

-41-

long term" to Musselshell County. AR:2-2019-147-8963; *see In re Bull Mountains Mine*, No. BER 2016-03 SM, at 86, ¶ 134 (Mont. Bd. of Envtl. Rev. Jan. 14, 2016) (mine "threatens significant economic harm in the long term") (attachment 8). A temporary economic boom does not outweigh long-term harm to the economy and the environment. *See League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (long-term harm outweighs temporary delay).

### 3.   Enjoining repeated unlawful action is necessary to ensure the rule of law.

"The public possesses an interest in [an agency's] compliance with NEPA's environmental review requirements and informed decision-making." *Indigenous Envtl. Network v. Dep't of State*, No. CV-17-29-GF-BMM, 2019 WL 652416, at *10 (D. Mont. Feb. 15, 2019).

This is the Office's second failure to lawfully disclose the impacts of this expansion. Absent injunctive relief, there is no reason to believe that the Office will right its path. *See Pub. Serv. Co. of Colo. v. Andrus*, 825 F. Supp. 1483, 1509-10 (D. Idaho 1993) (issuing injunction where agency "refus[ed] to comply with the law").

Moreover, given that the harm inflicted upon the planet and the public from coal combustion so dramatically outweighs the value of the coal, the public interest favors an injunction. *See supra* Remedy Part II.A-B.1; *MEIC II*, 2017 WL

-42-

5047901, at *5-6 (public interest supported injunction in part due to enormous costs of GHG pollution).

## CONCLUSION

The Office again shirked its duties of disclosure under NEPA. It also ignored significant threats to grizzlies and northern long-eared bats. This Court should grant Conservation Groups' motion for summary judgment, vacate the decision, and enjoin operations in federal coal in the expansion until the Office complies with NEPA and the ESA.

Respectfully submitted this 28th day of June, 2019.

/s/ Shiloh Hernandez
Shiloh S. Hernandez
Laura H. King
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org
king@westernlaw.org

*Attorneys for Plaintiffs*

-43-

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is double-spaced, has a typeface of 14 points or more, and contains 7,976 words, excluding caption, signature, certificates of service and compliance, table of contents and authorities, and exhibit index. I relied on Microsoft Word to obtain the word count.

/s/ Shiloh Hernandez
Shiloh S. Hernandez

-44-

Pls.' Br. in Spt. of MSJ
350 MT v. Bernhardt, CV 19-12-M-DWM