

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| 350 MONTANA, et al., | CV 19–12–M–DWM |
| Plaintiffs, | |
| vs. | OPINION |
| | and ORDER |
| DAVID BERNHARDT, et al., | |
| Defendants, | |
| and | |
| SIGNAL PEAK ENERGY, LLC, | |
| Defendant-Intervenor. | |

Plaintiffs are environmental organizations challenging, once again, the

Office of Surface Mining Reclamation and Enforcement's ("Enforcement Office")

approval of Signal Peak Energy, LLC's application to expand the Bull Mountains

Mine. The expansion was first approved in 2015 but was enjoined for violating the

National Environmental Policy Act ("NEPA"). *Mont. Envtl. Info. Ctr. v. U.S.*

*Office of Surface Mining*, 274 F. Supp. 3d 1074, 1105 (D. Mont. 2017). In 2018,

the Enforcement Office approved the expansion a second time. This suit

challenges the 2018 approval under NEPA and the Endangered Species Act

("ESA"). Pending before the Court are cross-motions for summary judgment.

1

(Docs. 36, 41, 43.) A hearing was held on March 4, 2020. For the following reasons, summary judgment is proper for Plaintiffs on their claim that the Enforcement Office violated NEPA by failing to adequately consider the risk of coal train derailments. The Enforcement Office prevails on the remaining claims.

## BACKGROUND

The Bull Mountains Mine is an underground coal mine in south-central Montana, approximately 30 miles north of Billings. AR16736. The history of the mine and the regulatory framework under which it operates are set forth in the previous case. *Mont. Envtl. Info. Ctr.*, 274 F. Supp. 3d at 1081–85. That case invalidated the 2015 Environmental Assessment ("EA") for failing to adequately assess the effects of increased coal train traffic and increased greenhouse gas emissions that would result from the expansion. *Id.* at 1090–99. The matter was remanded to the Enforcement Office and the expansion was enjoined. *Id.* at 1105.

The Enforcement Office published another EA in May 2018, AR16730–17006, and approved the expansion in August 2018, AR17023–26. Plaintiffs filed this suit in January 2019, requesting declaratory and injunctive relief. (Compl., Doc. 1.) Specifically, they allege the Enforcement Office violated NEPA by failing to prepare an Environmental Impact Statement ("EIS") (Count 1), failing to take a "hard look" at the effects of coal transportation and greenhouse gas emissions (Counts 2, 3), and failing to consider reasonable alternatives (Count 4),

and violated the ESA by concluding the expansion would not affect grizzly bears or northern long-eared bats (Counts 5, 6). (*Id.* at ¶¶ 121–206.) Signal Peak intervened in February 2019. (Doc. 9.) The parties subsequently filed the present cross-motions for summary judgment. (Docs. 36, 41, 43.)

## LEGAL STANDARD

NEPA and ESA claims are reviewed under the Administrative Procedure Act ("APA"), which authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Summary judgment is proper "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is particularly applicable to judicial review of final agency action, where the issue is "whether or not as a

3

matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks omitted).

**ANALYSIS**

## I. NEPA

NEPA does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002) (internal quotation marks omitted). It requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To assist in deciding whether an EIS is necessary, an agency may prepare an EA. 40 C.F.R. § 1501.4. While an EA is a "concise public document," it must describe the proposed action, discuss alternatives, and consider environmental impacts. *Id.* at § 1508.9. If an agency decides in an EA that the proposed action will not have any significant impact, it may issue a "Finding of No Significant Impact" instead of preparing an EIS, as the Enforcement Office did here with respect to the mine expansion. *Id.* at §§ 1508.9(a)(1), 1508.13.

Here, Plaintiffs argue the Enforcement Office violated NEPA by (1) failing to adequately consider the effects of increased rail traffic and increased greenhouse

4

gas emissions that would result from the expansion in the EA and (2) issuing a

Finding of Significant Impact rather than complete an EIS.

## A. Effects of Coal Transportation and Greenhouse Gas Emissions

An EA must address the environmental effects of the proposed action,

including indirect and cumulative effects. *Id.* at § 1508.9(b); *Ctr. for Envtl. Law &*

*Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011). A

cumulative effect "is the impact on the environment which results from the

incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions regardless of what agency (Federal or non-Federal) or

person undertakes such other actions." 40 C.F.R. § 1508.7. Indirect effects are

those "which are caused by the action and are later in time or farther removed in

distance, but are still reasonably foreseeable." *Id.* at § 1508.8(b). Agencies "need

not consider potential effects that are highly speculative or indefinite." *Presidio*

*Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998) (internal

quotation marks omitted).

### 1. Coal Transportation

Coal is transported from the mine via freight trains to the Westshore

Terminal in Vancouver, British Columbia. AR16750–51. To get to the Westshore

Terminal, coal trains first travel a 30-mile spur that connects the mine to the

railroad at Broadview, Montana. AR16760. From Broadview, the trains travel to

Laurel, Montana, where they join the main line. *Id.* In 2016, 2.1 trains per day traveled to or from the mine. AR16786. That number grew to 3.6 trains per day from 2017 to 2019 due to increased production. *See id.* With the expansion, the 3.6 trains per day would continue for an additional nine years. AR16789. Plaintiffs argue the 2018 EA failed to consider the effects of increased train transportation on grizzly bears, public health, and the risk of derailments.

### a. Grizzly Bears

Plaintiffs argue the 2018 EA failed to take a hard look at the risk of train collisions with grizzly bears. The Enforcement Office responds that collisions between a train from the mine and a grizzly bear are too speculative to require NEPA analysis. On this record, the Enforcement Office has the better argument.

The record indicates that train collisions resulted in 35 grizzly bear deaths along the Flathead River between 1984 and 2004, AR16591, and three grizzly bear deaths in the Cabinet-Yaak region between 1982 and 2012, AR12841. However, the only record material on the connection between rail traffic and wildlife deaths is an EIS conducted by Washington state analyzing a proposed coal export terminal along the Columbia River. AR04481. The Washington EIS references two studies on the factors related to wildlife collisions, including train speed, rail alignment, train volume, and the abundance of wildlife along rail corridors. *Id.* In the end, though, the Washington EIS only concludes that an "increase in train

traffic . . . would increase the risk of wildlife strikes by trains." *Id.* NEPA only requires agencies to analyze effects that are reasonably foreseeable. 40 C.F.R. § 1508.7. There is nothing in the record about the risk of train collisions beyond the common-sense proposition that more trains mean more collisions. NEPA does not require agencies "to do the impractical, if not enough information is available to permit meaningful consideration." *Envtl. Prot. Info Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (internal quotation marks omitted). On this record, train collisions with wildlife are too attenuated from the mine expansion to warrant analysis under NEPA.

### b.    Public Health

Plaintiffs claim the 2018 EA failed to take a hard look at the effects of emissions from increased rail traffic on public health. Specifically, Plaintiffs challenge (1) the conclusion that rail emissions are transitory, (2) the failure to address whether rail emissions would increase cancer risks, (3) the treatment of current air quality in communities along the rail line, and (4) the purported failure to address cumulative impacts of rail emissions.

### i.    Transitory Emissions

The Enforcement Office concluded impacts on air quality from increased rail traffic would be negligible, in part because train emissions are transitory. AR16792; AR16836. Plaintiffs argue this contradicts evidence that emissions can

build up, relying on the Jaffe study, which observed an elevated level of particulate matter with a diameter of 2.5 microns or less ("PM$_{2.5}$") near rail lines in Washington state. *See* AR06124–34. They emphasize the Jaffe study's determination that the elevated level "is not only due to the 'spikes' that occur as a train passes, but also the residual that accumulates in the local airshed." AR06130. However, the Jaffe study explains that "[t]he topography in the Puget Sound region may also exacerbate the accumulation of PM$_{2.5}$ from trains." *Id.* Further, the Jaffe study described that "the instruments were located only a few meters higher than the tracks and the local topography likely creates a greater barrier to dilution of the train emissions. An additional factor is the cold temperatures of Puget Sound (10–12 °C), which cause a stable layer near the surface of Puget Sound." AR06129 (citation omitted). Because the Jaffe study's conclusions about concentrated emissions were specific to the study area, it does not undermine the Enforcement Office's conclusion that train emissions are transitory.

Plaintiffs also rely on *Great Basin Mine Watch v. Hankins* to argue the Enforcement Office must present data to support its conclusion that train emissions are transitory. 456 F.3d 955, 973 (9th Cir. 2006). That case involved the expansion of an open-pit gold mine in Nevada. *Id.* at 960. In analyzing the effects of the expansion on air quality in conjunction with other mining projects in the area, the EIS concluded "[c]umulatively, these mining emissions are minimized to

some degree because of project separation distances, *meteorological conditions that promote good dispersion*, and the fact that not all projects would produce emissions concurrently." *Id.* at 973 (emphasis added). However, this statement was not supported by any data and the Ninth Circuit held it was too conclusory to satisfy NEPA. *Id.* But *Great Basin Mine Watch* is distinguishable from this case for two reasons. First, it concerned emissions from a mine, while this case concerns emissions from trains as they travel to and from a mine. Second, the record here does support that train emissions disperse. Indeed, the Jaffe study shows that emissions "spike" or "peak" as a train passes, then decrease. AR06127; AR06130. Accordingly, the Enforcement Office's determination that train emissions are transitory is supported by the record.

### ii. Cancer Risks

The Enforcement Office acknowledged that diesel particulate matter from train emissions is likely carcinogenic but did not address how increased rail traffic would affect cancer rates along the rail routes. AR16837. Plaintiffs argue the failure to address cancer risks is arbitrary, relying on the Washington EIS for the proposed coal terminal on the Columbia River. The Washington EIS determined that rail traffic related to the coal terminal "would result in areas of increased cancer risk at or above 10 cancers per million" which it described as "unavoidable and significant." AR04050. Plaintiffs argue the Enforcement Office should

9

similarly quantify the increased cancer risk from coal trains. The Enforcement Office distinguished the Washington EIS because it was for "the full operation of the export terminal combined with operations from coal handling, hauling, and vessel transport." AR16948. Further, the coal terminal involved an additional 16 trains per day, AR16981, while the mine expansion only involves an additional 3.6 trains per day, AR16786. Based on these differences, the Washington EIS's quantification of cancer risks does not render the Enforcement Office's failure to do so arbitrary and capricious.

Rather, the Enforcement Office adequately considered the impacts of rail traffic on public health. The EA identified that emissions from rail traffic "can affect the heart and lungs and cause serious health effects," AR16763, and that diesel emissions in particular are "likely to be carcinogenic to humans by inhalation from environmental exposures," AR16837 (internal quotation marks omitted). And, though the EA did not quantify those risks, it explained why they will be mitigated. For example, with respect to the carcinogenic diesel emissions, the EA quoted an Environmental Protection Agency ("EPA") report on diesel engine exhaust that national ambient air quality standards, commonly referred to as the NAAQS, "would be expected to offer a measure of protection from effects associated with [diesel particulate matter]," and explained that carcinogenic diesel particulate matter is only a small portion of the total particulate matter released.

AR16947–48. Further, the EA offered evidence that air pollutants will decrease as old locomotive engines are replaced. AR16836. Finally, the EA explained that the increased rail traffic from the mine expansion is taking place against the backdrop of improving air quality. AR16791–92; AR16850. Based on all this, the Enforcement Office's analysis of increased rail traffic on public health was sufficient under NEPA.

### iii.    Current Air Quality

Plaintiffs argue the Enforcement Office failed to adequately consider the current level of $PM_{2.5}$ in communities along the rail line, particularly given the rail routes pass through or near areas in Montana that have not attained compliance with the EPA's national ambient air quality standards. AR16835–36. However, the EA cites data from the EPA that none of these nonattainment areas has recorded a certified exceedance of the $PM_{2.5}$ national standard for at least the last five years. AR16836.

Plaintiffs contend the Enforcement Office misread the EPA data, arguing the data show numerous exceedances of the $PM_{2.5}$ national standard. But as was made clear at the hearing, the exceedances Plaintiffs identify were caused by wildfires, which are exceptional events that are disregarded in assessing compliance with the national standards. The Enforcement Office did not err in concluding that baseline $PM_{2.5}$ levels along the rail line are consistent with the national standard.

11

Plaintiffs also argue the Enforcement Office's conclusions on $PM_{2.5}$ levels

are belied by the American Lung Association's 2017 State of the Air report, which

they claim identified numerous exceedances of the $PM_{2.5}$ national standard in

communities along the rail lines. *See* AR17207–11. However, Plaintiffs overstate

the degree to which the American Lung Association report contradicts the EPA

data. For example, though the report identifies Lincoln County as having one of

the nation's highest levels of year-round $PM_{2.5}$ pollution, it gives Lincoln County a

"pass" under the EPA's national standard. AR17211. Further, the report

acknowledges that Missoula's air quality improved with fewer days of spikes in

the particle levels. AR17199. In any event, because the court's role is limited to

assessing whether the agency made a clear error in judgment in selecting which

studies to rely on, *Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051–52 (9th

Cir. 2012), the American Lung Association's somewhat contradictory report does

not undermine the Enforcement Office's reliance on the EPA data.

Plaintiffs further challenge the Enforcement Office's conclusion that areas

with historically degraded air quality are likely to have developed mitigation

measures. However, the EA highlights Missoula's successful program with

respect to particulate matter with a diameter of 10 microns or less ("$PM_{10}$") as an

example. AR16836; AR16791. Accordingly, it was not arbitrary and capricious to

predict that local measures will contribute to the general improvements in air

quality identified in the EA.  AR16850.

### iv.    Cumulative Impacts

Plaintiffs argue the Enforcement Office failed to assess the cumulative impacts of the emissions from increased rail traffic on public health.  As Plaintiffs note, the EA explicitly discusses the cumulative effects of coal dust resulting from the increased rail traffic.  AR16792.  However, the EA groups the discussion on the cumulative effects of rail emissions with the discussion of air quality effects from the mine, generally.  AR16792–93.  Plaintiffs argue the Enforcement Office should have separately discussed the cumulative effects of rail emissions, like it did for coal dust.  However, the coal dust discussion also applies to emissions.  For example, with respect to coal dust, the EA explains that "[i]ncreases to port capacity are not foreseeable, so the future rate of coal transport on the Main Line would not change significantly from recent shipping rates." *Id.*  That applies generally to coal trains, including their emissions.  Further, Plaintiffs' contention that the Enforcement Office should have analyzed cumulative emissions from "the thousands of other trains shipping coal annually to the same coal port and coal plants in Oregon and Washington," (Doc. 37 at 24–25), is beyond what NEPA requires, *cf. Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (discussing "rule of reason" in NEPA review).

### c.  Derailments

Plaintiffs argue the 2018 EA failed to adequately consider the risk of train derailments from the increased rail traffic.  The Enforcement Office responds that the possibility of a derailment is too speculative to require NEPA analysis.  Given the severity of train derailments and the certainty with which they can be predicted, the Enforcement Office should have addressed the risk under NEPA.

Apart from acknowledging that coal dust can decrease track stability and the mitigation measures in place to limit that risk, AR16761; AR16970, the EA did not discuss derailments.  Instead, it concluded that "derailments are not a normal part of rail operation which is designed to minimize the risk of such events.  While derailments do occur, the location and effects of such derailments would be highly speculative and are therefore not analyzed."  AR16949.

However, the record indicates that the risk of derailments can be quantified. The Washington EIS used published accident data to predict the number of accidents per year for each rail segment, using the formula (segment length) x (number of trains) x (accident rate for segment) = (predicted accidents per year for segment).  AR04528.  The risk—two accidents per million train miles, at least in Washington—is no doubt remote.  However, NEPA imposes a "duty to describe the consequences of a remote, but potentially severe impact" if an agency can do so without resorting to conjecture.  *Robertson v. Methow Valley Citizens Council,*

14

490 U.S. 332, 355 (1989) (internal quotation marks omitted). And here, the

Enforcement Office was on notice of the potentially severe impacts of train

derailments. For example, one commenter recalled a coal train derailment near

Heron, Montana and explained that "the coal in question along the bank began to

smolder in the days between its derailment and being cleaned up. Loose piles of

coal are subject to spontaneous combustion and, once started, coal fires are

notoriously difficult to extinguish." AR12973–74. Accordingly, the agency

should have analyzed the risk of train derailments.

### 2.    Greenhouse Gas Emissions

This Court previously held that the 2015 EA failed to adequately assess the

impacts of greenhouse gas emissions from the combustion of coal mined from the

expansion. *Mont. Envtl. Info. Ctr.*, 274 F. Supp. 3d at 1094–99. Specifically, the

failure to quantify the costs of greenhouse gas emissions was arbitrary and

capricious when the EA quantified the benefits and where the Social Cost of

Carbon protocol was an available tool to measure the costs. *Id.* at 1098–99.

Like the 2015 EA, the 2018 EA does not apply the Social Cost of Carbon

protocol. Instead, it concludes that the protocol is too uncertain and indeterminate

to be useful to the analysis. AR16881–83. The discussion cites five academic

publications and a Bureau of Land Management report on the indeterminacy of the

Social Cost of Carbon protocol and similar models. AR16882 at n.9. NEPA's

15

goal is informed decision-making. *See, e.g., Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005). It does not require agencies to consider information that is not helpful. The Enforcement Office's conclusion, supported in the record, that the protocol is too uncertain and indeterminate to aid its decision-making satisfies NEPA. *See EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 79 (D.D.C. 2019); *Wilderness Workshop v. Bureau of Land Mgmt.*, 342 F. Supp. 3d 1145, 1159–60 (D. Colo. 2018); *W. Org. of Res. Councils v. Bureau of Land Mgmt.*, CV 16-21-GF-BMM, 2018 WL 1475470, at *14 (D. Mont. Mar. 26, 2018).

## B.     Finding of No Significant Impact

Plaintiffs challenge the Enforcement Office's decision to issue a Finding of No Significant Impact rather than prepare an EIS. To succeed on this claim, Plaintiffs must raise "substantial questions" about whether the mine expansion will have a significant effect on the environment. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1136 (9th Cir. 2011). "In reviewing an agency's decision not to prepare an EIS, the arbitrary and capricious standard under the APA requires this court to determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* at 1132 (internal quotation marks omitted) (alteration in

16

original). The statement of reasons must address significance in terms of the "context" and "intensity" of the proposed action. 40 C.F.R. § 1508.27. Intensity "refers to the severity of impact," and involves an analysis of ten factors. *Id.* at § 1508.27(b). Plaintiffs argue the Enforcement Office failed to consider seven of those ten factors. However, the Enforcement Office adequately analyzed the context and intensity of the mine expansion and its Finding of No Significant Impact is supported by the record.

### 1. Adverse Impacts and Public Health

In considering whether to prepare an EIS, an agency must consider "[i]mpacts that may be both beneficial and adverse." *Id.* at § 1508.27(b)(1). Agencies must also consider "[t]he degree to which the proposed action affects public health or safety." *Id.* at § 1508.27(b)(2). In arguing that the Enforcement Office failed to consider these factors, Plaintiffs merely incorporate their arguments on increased rail traffic and greenhouse gas emissions. As discussed above, the Enforcement Office's conclusions that increased rail traffic would not impact public health and its failure to quantify costs using the Social Cost of Carbon protocol do not violate NEPA. The statement of reasons sufficiently considers the impacts of greenhouse gas emissions from the expansion and the impacts of rail traffic on public health.

## 2. Uncertainty and Controversy

NEPA requires the preparation of an EIS when an action's "effects on the quality of the human environment are likely to be highly controversial" or "are highly uncertain or involve unique or unknown risks." *Id.* at § 1508.27(b)(4), (b)(5). Here, Plaintiffs unsuccessfully argue the effects of the mine expansion are both "highly controversial" and "highly uncertain."

### a. Controversy

Plaintiffs argue experts controvert the Enforcement Office's conclusions on the magnitude of the mine expansion's impacts, rendering the impacts controversial. "A federal action is controversial if a substantial dispute exists as to [its] size, nature, or *effect.*" *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997) (internal quotation marks omitted) (emphasis and alteration in original). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or [Finding of No Significant Impact] casts serious doubt upon the reasonableness of an agency's conclusions." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019) (internal quotation marks omitted). "Although a court should not take sides in a battle of the experts, it must decide whether the agency considered conflicting expert testimony in preparing its [Finding of No Significant Impact], and whether the agency's methodology indicates that it took a hard look at the proposed action by reasonably and fully

informing itself of the appropriate facts." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 n.14 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (citations omitted). Mere public opposition to a proposed action does not render the action controversial under NEPA, even if the opposition is vigorous. *Nw. Envtl. Def. Ctr.*, 117 F.3d at 1536.

Plaintiffs cite six comments by experts in the record. However, to the extent the experts disagree with the Enforcement Office, they have not raised a "substantial dispute" as to the expansion's "size, nature, or effect" that would render the expansion "highly controversial." *See id.*

Three of the experts, economists Michael Greenstone and Thomas Power and the group the Union of Concerned Scientists, commented on the Social Cost of Carbon protocol. AR05601–14; AR17073–96; AR05522–97. Neither Professor Greenstone nor the Union of Concerned Scientists addressed the protocol's indeterminacy, which, as discussed above, is a rational explanation supported in the record and accepted by multiple courts. *See* AR05602–04; AR05581–95. Only Dr. Power addressed the variability in the protocol's results, and his discussion confirms, not contradicts, the Enforcement Office's position. For example, he acknowledged that "there is no consensus on the appropriate social discount rate to use for future social costs." AR17082. He also estimated the

Social Cost of Carbon for the mine expansion, with the results ranging from $3.2 billion to $32.5 billion. AR17085. Though all three comments advocate the utility of the Social Cost of Carbon protocol, none raises a "substantial dispute" over the Enforcement Office's conclusion that the protocol is too indeterminate to be useful. *Nw. Envtl. Def. Ctr.*, 117 F.3d at 1536.

Two medical doctors, Dr. Brian Moench and Dr. Paul Smith, commented on the negative health impacts of air pollution. AR17056–72. However, neither addressed the impacts of the mine expansion; their discussions are limited to the general effects of air pollution and, in that regard, their concerns are reflected in the EA. For example, the EA recognizes that "[p]articulate emissions (i.e., $PM_{10}$ and $PM_{2.5}$) can affect the heart and lungs and cause serious health effects," AR16763, and that "[e]ffects of most industrial source air pollutants are limited to the immediate area or, at most, the region surrounding the source. However, mercury emissions can also have a global effect. Exposure to mercury threatens human health, with developing fetuses and young children most at risk. Mercury pollution can also harm wildlife and ecosystems." AR16764. Ultimately, Dr. Moench and Dr. Smith's comments merely repeat information that is included in the EA and do not raise a "substantial dispute" over the expansion's impacts on public health.

The earth scientist, James Hansen, commented on climate change.

AR13356–71. However, he only addressed the mine expansion in two statements: that additional coal mining presents an "unacceptable danger," AR13358, and that "[a]llowing the Defendant-Intervenor to prepare to expand its Bull Mountain Coal Mine would be a major step in precisely the wrong direction, in light of the total coal reserves at stake in this litigation," AR13370. But the EA acknowledges the same climate conditions as Dr. Hansen. It quantifies increases in global, national, and local emissions over the past decades. AR16767. It also specifies that the earth is warming, the average combined land and ocean surface temperature have increased, extreme weather events and the incidence of large forest fires are linked to climate change, and climate change has affected wildlife and crops and resulted in increased flooding. AR16876–78. Indeed, Plaintiffs do not challenge the Enforcement Office's qualitative discussion of the impacts of greenhouse gases, which, as this Court previously noted, was thorough. *See Mont. Envtl. Info. Ctr.*, 274 F. Supp. 3d at 1095. Dr. Hansen's comment highlights the difficulty in combatting climate change on a project-by-project basis, but it does not render the mine expansion "highly controversial" such that an EIS is required.

### b. Uncertainty

An EIS is mandated "where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent speculation on potential . . . effects." *WildEarth Guardians*, 923 F.3d at 673 (internal quotation

marks omitted) (alteration in original). Plaintiffs argue the Finding of No

Significant Impact's statement that none of the expansion's effects are "highly

uncertain or involve unique or unknown risks" is contradicted by the EA's

repeated claims of uncertainty. AR16728. However, the only uncertainty about

the expansion's effects discussed in the Finding of No Significant Impact is "some

uncertainty about the long-term cumulative effects of [greenhouse gases] and how

these effects can be managed when not currently quantifiable or predictable."

AR16728. An EIS is not required when there is only "some" uncertainty.

*WildEarth Guardians*, 923 F.3d at 673.

### 3. Cumulatively Significant Impacts

In deciding whether to prepare an EIS, an agency must consider "[w]hether

the action is related to other actions with individually insignificant but

cumulatively significant impacts. Significance exists if it is reasonable to

anticipate a cumulatively significant impact on the environment. Significance

cannot be avoided by terming an action temporary or by breaking it down into

small component parts." 40 C.F.R. § 1508.27(b)(7). Plaintiffs argue the Finding

of No Significant Impact's statement that "[t]here were no significant cumulative

effects identified," AR16728, is arbitrary and capricious in light of the EA's

recognition that "[c]ontinued emission of [greenhouse gases] will cause further

warming and long-lasting changes in all components of the climate system,

increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems," AR16879. The Enforcement Office responds that it considered greenhouse gas emissions in a local, national, and global context and assessed the downstream impacts, AR16766–69; AR16878–80, that the expansion would account for only 0.04 percent of annual national emissions and 6.43 percent of annual state emissions, AR16794, and that the aggregate global emissions over the nine-year life of the expansion would be equivalent to only 0.44 percent of global emissions from just one year, *id.*

Plaintiffs' argument ignores that analysis and instead hinges on one cherry-picked statement in the EA that summarizes a 2014 report by the Intergovernmental Panel on Climate Change. *See* AR16879. Though Plaintiffs illustrate the challenges in mitigating a global problem on a project-specific basis, highlighting one statement in the EA does not raise "substantial questions" about the impacts of the mine expansion. *Barnes*, 655 F.3d at 1136.

### 4. Endangered Species

An EIS may be required depending upon "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat." 40 C.F.R. § 1508.27(b)(9). On this factor, Plaintiffs merely incorporate their arguments that the Enforcement Office violated the Endangered Species Act. As discussed below, the Enforcement Office did not act arbitrarily in concluding that the expansion will

not adversely affect endangered species.

### 5.    Clean Water Act Violations

In deciding whether to prepare an EIS, an agency must consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.* at § 1508.27(b)(10). Plaintiffs argue the discharge of coal dust from coal trains will result in violations of the Clean Water Act, 33 U.S.C. § 1311(a), citing *Sierra Club v. BNSF Railway Co.,* C13-967-JCC, 2016 WL 6217108 (W.D. Wash. Oct. 25, 2016). In that case, the district court held at summary judgment that the railroad would be liable under the Clean Water Act for coal particles discharged from train cars directly into regulated waters, but that factual disputes remained as to whether such discharges had occurred. *Id.* at *9. The parties entered a consent decree requiring the railroad to take various remedial actions. *Sierra Club v. BNSF Ry. Co.,* 276 F. Supp. 3d 1067, 1071 (W.D. Wash. 2017). Ultimately, then, there was no judgment that the coal trains violated the Clean Water Act. The Enforcement Office argues that the railroad would be responsible to secure Clean Water Act permits for coal trains, if necessary, and there is no reason to presume the railroad would violate the law.

There is little Ninth Circuit case law interpreting the "[w]hether the action threatens a violation of Federal, State, or local law" provision of the NEPA regulations. What little law there is concerns whether the action agency violated

24

substantive law in undertaking a project. *See WildEarth Guardians*, 923 F.3d at 675 n.7 (concluding Forest Service did not violate federal law in approving travel management plan in the Kaibab National Forest); *In Defense of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1071 n.25 (9th Cir. 2014) (concluding Bureau of Land Management did not violate federal law in gathering wild horses and burros); *No GWEN All. of Lane Cty., Inc. v. Aldridge*, 855 F.2d 1380, 1387 (9th Cir. 1988) (concluding Air Force's installation of radio towers would not violate local zoning laws). None considers whether a downstream violation by another entity would require preparation of an EIS. However, the question is unnecessary to resolve. Because Plaintiffs have not shown that coal trains violate the Clean Water Act on this record, their argument is insufficient to require an EIS.

## II.   ESA

Section 7 of the ESA directs each agency to consult with the Fish and Wildlife Service or National Marine Fisheries Service to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or cause the "destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b). Generally, formal consultation is required for any agency action that "may affect" a protected species or its designated critical habitat. 50 C.F.R. § 402.14. To determine whether an action "may affect" a protected species

or critical habitat, the "agency must consider 'the direct and indirect effects of [its] action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action.'" *Sierra Club. v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1224 (9th Cir. 2015) (quoting 50 C.F.R. § 402.02) (alteration in original).[1] Here, the Enforcement Office determined the expansion would not affect protected grizzly bear and northern long-eared bat populations, and therefore did not engage in consultation. Plaintiffs challenge those "no effect" determinations.

## A.  Grizzly Bear

Plaintiffs argue the Enforcement Office violated the ESA by failing to consider the effects of increased rail traffic on grizzly bears. As discussed above, this argument fails under NEPA. Though the standard varies slightly, it also fails under the ESA.

The parties debate whether the Enforcement Office considered the proper "action area" in analyzing the effects of the expansion under the ESA. But "[a]ction area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved." 50 C.F.R. § 402.02. The

---

[1] The definition of "effects" in 50 C.F.R. § 402.02 was amended effective October 28, 2019. 84 Fed. Reg. 44976, 45016 (Aug. 27, 2019); 84 Fed. Reg. 50333, 50333 (Sept. 25, 2019). The definition that was in effect when the Enforcement Office conducted the analysis at issue is applied here.

action area is coextensive with the scope of the action's indirect effects. The question, then, is whether the Enforcement Office properly considered the indirect effects of the mine's expansion on grizzly bears. Under the ESA, "[i]ndirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*

The Ninth Circuit has not addressed how the ESA's definition of indirect effects as those that are "reasonably certain to occur" relates to NEPA's definition as those that are "reasonably foreseeable," *compare id. with* 40 C.F.R. § 1508.8(b), though it has observed that "[t]he NEPA regulations share with the Endangered Species Act regulations a similar definition of 'indirect effects,'" *Defs. of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 962–63 (9th Cir. 2005), *overruled on other grounds by Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007). In implementing the "reasonably certain to occur standard," the Fish and Wildlife Service and National Marine Fisheries Service explained that it was narrower than NEPA's "reasonably foreseeable" standard. 51 Fed. Reg. 19926, 19932–33 (June 3, 1986). More recently, the Fifth Circuit has expressed that "actions 'reasonably certain to occur' are also 'reasonably foreseeable.'" *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010). Based on these interpretations of the standards, the NEPA analysis controls Plaintiffs' ESA claim regarding the effects of increased rail traffic on grizzly bears:

On this record, grizzly bear collisions are not reasonably foreseeable under NEPA, thus they are also not reasonably certain to occur under the ESA.

Plaintiffs nonetheless argue train collisions are reasonably certain to occur based on a 2019 report by David Mattson, a researcher who estimates that train strikes have caused 9% of known grizzly bear deaths in the Northern Continental Divide and Cabinet-Yaak Ecosystems, through which the train routes travel. (Doc. 37-4 at ¶¶ 1, 8.) However, Mattson's report is post-decisional and extra-record. Judicial review of agency action is generally limited to the administrative record that existed at the time the agency made its decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); 5 U.S.C. § 706. Contrary to Plaintiffs' view, this Court has consistently concluded that *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011), did not eliminate the administrative record limitation in ESA cases. *See All. for the Wild Rockies v. Probert*, --- F. Supp. 3d ----, 2019 WL 4889253, at *3 (D. Mont. 2019) (collecting cases). Plaintiffs have not argued that Mattson's report fits into a recognized extra-record exception. *See Lands Council*, 395 F.3d at 1030 (outlining exceptions). Accordingly, the report cannot properly be considered. Because the record does not demonstrate that grizzly bears collisions are "reasonably certain to occur," the Enforcement Office's determination that the mine expansion would not affect grizzly bears is not arbitrary and capricious.

## B.    Northern Long-eared Bat

The Enforcement Office determined there are no northern long-eared bats and no suitable habitat exists for them in the vicinity of the mine and consequently concluded that the expansion would have no effect on the species.  AR16583. Contrary to Plaintiffs' arguments, the Enforcement Office's determination is adequately supported in the record.

With respect to the presence of northern long-eared bats, Plaintiffs contend that a 2006 acoustic survey as well as acoustic data collected from 2015 to 2018 detected the species in the vicinity of the mine.  However, the Enforcement Office concluded the 2006 acoustic survey was likely a misidentification, citing that "no other observations have been documented between the years 1989 and 2016" and that, based on information from the United States Fish and Wildlife Service and the Montana Natural Heritage Program, the "[m]ine is well outside of the known and predicted range of northern long-eared bat."  AR16583; AR16775.  The acoustic data collected from 2015 to 2018 are extra-record, and the expert analysis of it completed at Plaintiffs' request in December 2018 is extra-record and post-decisional; they are not considered for the same reason the Mattson report is not considered.  Based on the record, the Enforcement Office conclusions that the 2006 acoustic survey was likely a misidentification and that northern long-eared bats are not present in the vicinity of the mine are not arbitrary.

With respect to whether any suitable habitat for northern long-eared bats occurs in the vicinity of the mine, Plaintiffs contend the species lives in Ponderosa Pine forests and that such forests exist in the Bull Mountains. They cite a report from Wyoming that explains the species is "strongly associated with forests," females in the Black Hills of South Dakota roost in "highly decayed, large diameter Ponderosa Pine (*Pinus ponderosa*) snags," and "[i]n Wyoming, the species is only known from the Black Hills region in areas dominated by contiguous Ponderosa Pine forest." AR:FWS-26-2.[2] Further, they cite the EA, which explains that vegetation in the Bull Mountains "*varies from ponderosa pine and Rocky Mountain juniper forests* on uplands, rock outcrops, and ravines at higher elevations, to sagebrush and mixed prairie grassland communities on benches, slopes, and drainages where soils are deeper," AR16772 (emphasis added), and a report prepared by Signal Peak in the 2016 record that explains the mine "falls within the Pine Breaks region of southeastern Montana," which "extend[s] roughly from the Musselshell River in central Montana southeastward to the western foothills of the Black Hills." AR:1-2016-2-9440.[3]

The Enforcement Office's habitat assessment relied on the Montana Natural

---

[2] Citations to the Fish and Wildlife Service Record are formatted as AR:FWS-[Excel Spreadsheet Row]-[PDF Page #].
[3] Citations to the 2016 record are formatted as AR:[USB Disc #]-2016-[Folder #]-[Bates #].

Heritage Program Field Guide, which provides that "[a]ll active season captures within the state have been in or near riparian forest dominated by cottonwood (Populus spp.) and green ash (Fraxinus pennsylvanica) typical of the Great Plains Floodplain Ecological System." AR19165 (citations omitted). Further, they rely on the same description of the Bull Mountains' vegetation as Plaintiffs, which does not include cottonwood and green ash riparian forests. *See* AR16772. While the Enforcement Office could have explicitly distinguished the report about northern long-eared bat habitat in Wyoming, its decision to rely on the Montana-specific information for a Montana-based project is rational and its determination that there is no suitable habitat in the vicinity of the mine is not a "clear error of judgment." *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc).

## III.  Unaddressed Claim

Plaintiffs allege the Enforcement Office violated NEPA by failing to consider reasonable alternatives (Count 4), but Plaintiffs have not argued that at summary judgment. That claim is thus conceded.

### CONCLUSION

IT IS ORDERED that Plaintiffs' motion for summary judgment (Doc. 36) is GRANTED as to Count Two of the Amended Complaint on the ground that the Enforcement Office violated NEPA by failing to analyze the risk of coal train derailments and DENIED as to Counts One, Three, Four, Five, and Six. The

31

Enforcement Office and Signal Peak's motions for summary judgment (Docs. 41, 43) are correspondingly GRANTED and DENIED.

IT IS FURTHER ORDERED that the 2018 EA is VACATED and this matter is REMANDED to the Enforcement Office for further action consistent with this Order. The Clerk of Court is directed to enter judgment consistent with this Order and close the case.

DATED this ___9th___ day of March, 2020.

15:41 P. M.

Donald W. Molloy, District Judge
United States District Court