IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| 350 MONTANA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DEB HAALAND, et al.,<br><br>Defendants,<br><br>and<br><br>SIGNAL PEAK ENERGY, LLC,<br><br>Defendant-Intervenor. | CV 19–12–M–DWM<br><br>ORDER |

On October 14, 2022, the Ninth Circuit Court of Appeals affirmed in part and reversed in part the Court's March 09, 2020 Order, (Doc. 59), and remanded the matter for further proceedings, *350 Mont. v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022); (*see also* Docs. 68, 69). On December 2, 2022, a status hearing was held on the record to consider how the parties wished to proceed in light of the Circuit's order; specifically, whether remand to the agency, vacatur, and/or additional factfinding were needed. (*See* Doc. 83 (Min. Entry); *see also* Doc. 92 (Trans.).) Subsequently, the parties were ordered to brief the issue of vacatur.

1

(Doc. 84.) Having considered their responses, (*see* Docs. 94, 95, 96), vacatur is warranted.

## BACKGROUND

The Bull Mountains Mine No. 1 (the "Mine") is an underground coal mine in central Montana, located approximately 30 miles north of Billings, and operated by Defendant-Intervenor Signal Peak Energy, LLC ("Signal Peak"). A detailed accounting of the Mine's history and the regulatory framework in which it operates can be found in the March 2020 Opinion and Order. (*See* Doc. 59 at 2–3.) Relevant here, the Court previously vacated and set aside the United States Office of Surface Mining Reclamation and Enforcement's ("Enforcement Office") 2015 environmental assessment ("2015 EA"), assessing a proposed expansion of mining on Signal Peak-leased federal land at the Mine ("Mine Expansion") and enjoined mining federal coal within the expansion boundary pending compliance with the National Environmental Policy Act ("NEPA"). *Mont. Envtl. Info. Ctr. v. U.S. Off. of Surface Mining*, 274 F. Supp. 3d 1074, 1105 (D. Mont. 2017). The Enforcement Office then published another EA in 2018 ("2018 EA"), again approving the Mine Expansion. (*See* Doc. 59 at 2.) Plaintiffs in this case challenged the 2018 EA. (*See generally* Doc. 1.) After considering the parties' cross motions for summary judgment, the Court vacated the 2018 EA and remanded the matter to the

Enforcement Office for further action. (Doc. 59 at 31–32.) Federal Defendants and Plaintiffs promptly appealed. (Docs. 61, 62.)[1]

On appeal, the Ninth Circuit held that the Enforcement Office violated NEPA by "failing to provide a convincing statement of reasons why the [Mine Expansion]'s impacts are insignificant." *350 Mont.*, 50 F.4th at 1259 (internal quotation marks omitted). The matter was remanded to this Court "to determine whether vacatur of the plan approval is warranted at this juncture." *Id.* at 1273. The Circuit also instructed that the Court "may reconsider, based on the existing record, whether to order an EIS, or remand to the agency to determine where to prepare a new EA or an EIS." *Id.* The Circuit further explained that "there is a dearth of evidence concerning the impact of vacatur, including whether Signal Peak is currently mining federal coal or state coal" and that "[a]dditional factfinding is necessary to determine whether vacatur of the plan approval is warranted at this juncture. *Id.*

Most recently, the Enforcement Office "has decided to prepare an environmental impact statement ("EIS") regarding Signal Peak's proposed Mine

---

[1] After the March 2020 decision and while the matter was pending on appeal, the Enforcement Office issued another EA ("2020 EA") incorporating the 2018 EA and further assessing the risk of coal train derailments, as ordered by the Court. (Doc. 96 at 2 n.2.)

Expansion to address the concerns raised by the court in its order." (Doc. 94-1 at ¶ 5.) The agency expects the EIS process to take 20 months. (*Id.* at ¶ 7.)

Based on the factual record, an evidentiary hearing regarding the impact of vacatur is not required. While the agency record has remained static, the post-remand record is now sufficient to make a determination about vacatur.

## ANALYSIS

Because the Enforcement Office has already decided to prepare an EIS, only the question of vacatur remains. "Although not without exception, vacatur of an unlawful agency action normally accompanies a remand." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (emphasis omitted). But a district court "is not required to set aside every unlawful agency action," *Nat'l Wildlife Fed. v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995), and may "leave invalid agency action in place when equity demands," *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (internal quotation marks omitted). To determine whether an agency's action should remain in effect on remand, courts must weigh "the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Id.* (internal quotation marks omitted). Because vacatur is the default remedy, the party opposing it has the burden to show that it is unnecessary. *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 157 (D.D.C. 2022).

4

Here, Plaintiffs ask the Court to follow the presumptive remedy for agency error and vacate. (Doc. 95 at 7.) Federal Defendants, on the other hand, request that vacatur be deferred pending the Enforcement Office's preparation of an EIS and the issuance of a new approval decision. (Doc. 94 at 2.) Finally, Signal Peak argues that the equities favor allowing it to mine federal coal in the Mine Expansion area while the Enforcement Office prepares an EIS. (Doc. 96 at 2.) Ultimately, vacatur is appropriate because Federal Defendants and Defendant-Intervenor fail to overcome the presumption in favor of vacatur and the equities favor that remedy. For the reasons outlined below, the Enforcement Office's Mine Expansion approval is vacated.

## I. Seriousness of the Errors

To determine the seriousness of an agency's errors, courts consider "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Ctr. for Food Safety*, 56 F.4th at 663–664 (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)). "[W]here an EIS was required but not prepared, courts should harbor substantial doubt that the agency chose correctly regarding the substantive action at issue." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052–53

(D.C. Cir. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022) (internal quotation marks and emphasis omitted).[2]

Plaintiffs argue that the seriousness of the Enforcement Office's NEPA violation is demonstrated by the Circuit's harsh rebuke of their scientific analysis. (Doc. 95 at 14.) Federal Defendants characterize their NEPA violation narrowly and argue that it does not amount to a serious error. (Doc. 95 at 7.) And, while Signal Peak notes that the seriousness of an agency's errors is relevant, it does not substantively argue the issue. Because the Enforcement Office's NEPA violations were central to its 2018 EA, the errors were sufficiently serious to warrant vacatur.

The Circuit held that Enforcement Office violated NEPA in two key ways: (1) "by failing to provide a convincing statement of reasons to explain why [the] project's impacts are insignificant"; and (2) that in comparing Mine Expansion emissions to domestic analogues, the Enforcement Office "did not account for the emissions generated by coal combustion, obscuring and grossly understating the magnitude of the Mine Expansion's emissions relative to other domestic sources of

---

[2] The D.C. Circuit recently held that "NEPA violations are serious notwithstanding an agency's argument that it might be ultimately able to justify the challenged action." *Standing Rock Sioux Tribe*, 985 F.3d at 1053. The Ninth Circuit has declined to extend this ruling. *Ctr. for Food Safety*, 56 F.4th at 663 n.11.

[greenhouse gases]." *350 Mont.*, 50 F.4th at 1259 (internal quotation marks omitted). These errors were serious.

NEPA requires that a federal agency take a "hard look" at a project's environmental consequences before approval. *Id.* at 1265. Unless the agency finds that a project's impacts will be insignificant after this review, the agency must prepare an EIS that identifies and rigorously appraises the project's environmental effects. *Id.* "[The] EIS must be prepared *before* agency action is taken." *Standing Rock Sioux Tribe*, 985 F.3d at 1039 (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002)); *see 350 Mont.*, 50 F.4th at 1273 (finding Plaintiff's argument that NEPA "requir[es] agencies to look *before* they leap" well-taken).

Based on the 2018 EA, the Enforcement Office determined that the Mine Expansion would not have significant impacts on the environment and therefore an EIS was not necessary. However, the Circuit held that this finding was not properly supported and, subsequently, the Enforcement Office independently decided to prepare an EIS. The Enforcement Office's realization that there is a potential for significant environmental impacts from the Mine Expansion inherently demonstrates the seriousness of the agency's errors. The question here is whether "the agency is capable of resolving uncertainty regarding the magnitude of the project's contribution to the environmental harms identified in the EA." *350*

7

*Mont.*, 50 F.4th at 1273. Because an EIS is now being conducted for the first time after repeated Mine Expansion approvals based on invalid EAs, and because the EA and the EIS processes involve such drastically different procedural and scientific requitements, *Ctr. for Bio. Div. v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008), "on remand, a different result may be reached," *Pollinator Stewardship Council*, 806 F.3d at 532. Contrary to Signal Peak's characterization, multiple EAs do not equate to an EIS. It is not a foregone conclusion that the agency will approve the expansion following the Enforcement Office's corrective NEPA process.

The Enforcement Office's errors cast substantial doubt on the agency's decision to approve the Mine Expansion in the first instance. That doubt is then augmented, not assuaged, by the agency's unilateral decision to prepare an EIS at this late stage of the proceedings. Therefore, the agency's errors are sufficiently serious to warrant vacatur.

## II.  Disruptive Consequences of Vacatur

The seriousness of the agency's errors must be weighed against "the disruptive consequences of an interim change that may itself be changed." *Pollinator Stewardship Council*, 806 F.3d at 532 (internal quotation marks omitted). Among the disruptive consequences considered are the environmental and economic impacts of vacatur. *See WildEarth Guardians v. Steele*, 545 F.

8

Supp. 3d 855, 885 (D. Mont. 2021). Courts generally decline to vacate an agency action when doing so would increase the potential for environmental harm. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). Other relevant considerations include economic and community-level impacts. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012).

Plaintiffs focus mainly on the disruptive environmental impacts of allowing the Mine Expansion approval to remain in place.[3] (Doc. 95 at 17.) Federal Defendants ask that the agency action remain in place while the Enforcement Office completes its corrective NEPA process because the equities favor maintaining the status quo. (Doc. 94 at 8.) Signal Peak similarly argues that maintaining the status quo is less disruptive to the environment and limits economic impacts. (Doc. 96 at 7–11.) Vacating the Mine Expansion approval will disrupt the Mine's longwall, Signal Peak's ability to mine federal coal, and its impact on the surrounding community. These disruptive consequences and the parties' arguments are discussed below.

---

[3] Plaintiffs also argue that the criminal and other bad acts of Signal Peak and its parent companies, (*see* Doc. 95 at 11–13), disqualify it from any consideration of an equitable remedy. This past behavior was not considered as it has no impact on the balancing of the equities.

9

### A.     Moving the Longwall

Signal Peak asserts that moving the longwall will increase regional greenhouse gas emissions, harm its workers, and cost Signal peak heavily. (Doc. 96 at 8.) Signal Peak mines using "a complex mechanized longwall mining system that excavates coal" from the Mine's underground coal seam. (Doc. 96-3 at ¶ 3.) The longwall mechanism weighs around 10,000 tons and is generally only moved once it has completed mining all of the coal in its area. (*Id.* at ¶ 7.) Signal Peak has moved the longwall eight times in the past fourteen years. (*Id.* at ¶ 5.) If it is prohibited from mining federal coal in the Expansion Area, Signal Peak expects it will need to disassemble and move the longwall twice to continue its operations mining State and private coal. (*Id.* at ¶ 8.) Each move of the longwall requires approximately 11,000 cubic yards of cement and over 484,000 pounds of steel and costs an estimated $2,000,000. (*Id.* at ¶¶ 10, 12.) These moves, specifically the concrete poured, and the steel used, is harmful to the environment. (Doc. 96 at 8.) Further, Signal Peak declares that the moves are the most dangerous part of its mining operation and exposes its workers to serious safety risks. (*Id.*)

Moving the longwall has disruptive consequences for Signal Peak; however, a decision to vacate the Mine Expansion approval is not a simultaneous order to move the longwall. Further, Signal Peak declares it plans to move the longwall regardless of whether the approval is vacated, (*id.* at ¶ 18), cutting against its

10

argument that vacatur will cause additional and disruptive environmental, economic, and safety impacts. Thus, while there are serious disruptive consequences faced by Signal Peak if it chooses to move its longwall mechanism, vacatur does not force Signal Peak to do so. Accordingly, these impacts do not outweigh the serious agency errors discussed above.

### B.   Mining the Expansion Area

Signal Peak argues that vacatur's impact on their ability to mine federal coal will cause both environmental and economic disruption, which weighs against vacatur. (Doc. 96 at 7–10.) They are correct as to the disruption but incorrect as to the ultimate remedy. In its decision remanding this matter for further factfinding, the Ninth Circuit requested more information on Signal Peak's current mining activities. *350 Mont.*, 50 F.4th at 1273. That record has now been made. Signal Peak is not currently mining federal coal in the Expansion Area but plans to mine over 4 million tons of coal there over the next two years. (Doc. 96-3 at ¶¶ 13–18.) They plan to begin by mining a relatively small amount of coal (900,00 tons) in March 2023 at the current longwall position, (*id.* at ¶ 13), and a more substantial quantity of federal coal (over 4 million tons) beginning in fall 2023, (*id.* at ¶ 17). Their plans also include mining larger swathes of coal in the Mine Expansion area in the succeeding years. (*Id.* at ¶¶ 19, 20.)

11

First, Signal Peak asserts that if it is not allowed to mine federal coal, its coal production and coal exports would be replaced from coal mined elsewhere, and no impact to global greenhouse gas emissions would result. Importantly, by Signal Peak's own admissions, it has enough coal on State- and privately-owned land to satisfy consumer demand during the two years the Enforcement Office expects to take to complete its environmental review. (Doc. 92 at 25.) Additionally, as Plaintiffs point out, and the 2018 EA found, the Mine Expansion would also negatively impact the environment. *350 Mont.*, 50 F.4th at 1272–73 (noting the court's agreement with the 2018 EA that there would be environmental impact from the Mine Expansion, but that the impact was not sufficiently analyzed). Signal Peak's assertion that greenhouse gas emissions would not change regardless of whether federal coal is mined cuts against its assertion that vacatur will have disruptive impacts. Further, although the Court does not dispute that vacatur may have an impact on the Mine's future while the Enforcement Office completes its EIS, that future is beyond the scope of this Order.

Second, Signal Peak declares that forgoing the mining of federal coal while the EIS is being prepared would cause permanent economic losses to Montana, the United States, and private entities. (Doc. 96 at 10.) Specifically, it declares that the State will lose approximately $126,000,000 in revenue, and the United States will lose approximately $27,000,000 in revenue. (Doc. 96-3 at ¶ 27.) It further

12

declares that private lessors may lose $20,000,000 in royalties. (*Id.*) Signal Peak conspicuously omits, however, the amount of money Signal Peak itself may leave in the ground if it is not able to access Mine Expansion federal coal. Signal Peak declares that if it is not allowed to mine federal coal in the Expansion Area, either in the next two years (while the Enforcement Office conducts its corrective NEPA process) or beyond, "the Mine Safety & Health Administration would not allow for the recovery of the bypassed coal." (*Id.* at ¶ 9.) It also believes its inability to mine federal coal past this two-year window would likely force the Mine to close. (*Id.* at ¶¶ 21–24.) While this economic impact has the potential to be both large and disruptive, the Mine Expansion's very existence results from invalid NEPA process, minimizing its weight in the balance of the equities.

Ultimately, Signal Peak's emphasis that mining federal coal in the Expansion Area will be the least disruptive environmental and economic option is challenging to consider because the multiple EAs conducted thus far have been deficient. Only the forthcoming EIS will clarify the significant impacts, thus it is impossible to judge whether the disruptive environmental impacts alleged by Signal Peak are sufficient to weigh in favor of overcoming the presumption of vacatur. *See 350 Mont.*, 50 F.4th at 1273. Similarly, the economic disruption of stopping the mining of federal coal may be large but NEPA's main concern is a project's environmental impact, not the economic impact of putting the project on

13

hold. *See* 42 U.S.C. § 4332(1). Accordingly, the disruptive consequences of prohibiting Signal Peak from mining federal coal until the Enforcement Office makes a new decision weighs towards vacatur.

### C. Community Impacts

Finally, vacatur may have impacts on the local community. Signal Peak's subsistence mining has harmed local ranching interests by creating fissures in the ranchland. (Doc. 95-3 at ¶ 24.) Additionally, Signal Peak's mining operation causes damage to local ranchers' water resources, including in one instance, damaging working water wells. (*Id.* at ¶ 20.) Local ranchers fear that Signal Peak's longwalls have already caused potentially irreversible damage to ranching in the Bull Mountains. (*See id.* at 28.) Although vacatur will not stop Signal Peak from mining, it is a consideration that weighs towards vacatur until further environmental impacts can be assessed.

### CONCLUSION

After balancing the equities and considering the status quo, vacatur is warranted. The disruptive consequences Signal Peak alleges are a product of its reliance on Mine Expansion approvals pursuant to invalid EAs. Although vacatur is certain to cause environmental, economic, and community impacts, the full impacts of the Mine Expansion itself will be unknown until the EIS is completed. Leaving the Mine Expansion approval in place, based on a deficient EA, risks

more potentially disruptive impacts than keeping it in place. A properly conducted EIS does not necessarily mean federal mining in the Expansion Area will proceed as Signal Peak desires.

Based on the foregoing, IT IS ORDERED that the Enforcement Office's approval of Signal Peak Energy, LLC's Bull Mountains Mine No. 1 expansion is VACATED. The matter is REMANDED to the Enforcement Office for the preparation of an EIS. (*See* Doc. 94.)

IT IS FURTHER ORDERED that the terms of the Ninth Circuit's mandate on remand have been fulfilled, (*see* Docs. 68, 69), the Clerk of Court is directed to close the case file. Any challenge to the agency's future EIS must be filed as a new case.

DATED this 10th day of February, 2023.

15:16 P.M.

Donald W. Molloy, District Judge
United States District Court

15